C. Brian BURKE, M.D., Plaintiff, Appellant,

v.

NATIONAL BROADCASTING COMPANY, INC., Defendant, Appellee.

No. 78–1562.

United States Court of Appeals, First Circuit.

Argued April 4, 1979.
Decided May 17, 1979.

David L. Nixon, Manchester, N. H., with whom Randolph J. Reis, Nashua, N. H., and Brown & Nixon Professional Association, Manchester, N. H., were on brief, for plaintiff, appellant.

James E. Higgins, Manchester, N. H., with whom Daniel W. Sklar, and Sheehan, Phinney, Bass & Green Professional Association, Manchester, N. H., were on brief, for defendant, appellee.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Dr. Burke, an amateur photographer, brought this action alleging that the National Broadcasting Company (NBC) broadcast parts of a movie filmed by him in violation of his alleged common law copyright therein. The parties agreed that there were no issues of fact bearing on the question of liability and filed cross-motions for summary judgment on that issue. The district court held that Dr. Burke had forfeited his common law copyright by allowing a general publication of his film to occur; from that judgment, Dr. Burke appeals.[1]

The evidence on liability, which the parties indicated at appellate argument was all the evidence they wished to submit, consisted of only affidavits by Burke and NBC and a series of letters. These and the admissions in the complaint and answer show that the movie in issue was shot by Dr. Burke while on a safari on the Serengeti Plain of East Africa (now Tanzania) in March 1972. It captured on film a highly unusual and dramatic encounter: a lioness attacks and kills a zebra foal and then, contrary to accepted belief about zebra behavior, the zebra mare returns and attacks the lioness. Only a month after this film was shot, *Natural History* magazine published an article stating that zebras do not protect their young against lions; in response, Dr. Burke wrote to the magazine

---

1. The parties' cross-motions were premised on the same legal principles and accepted the evidence before the court as the evidence to which those principles should be applied. *Cf.* 6 J. Moore, *Federal Practice* ¶ 56.13, at 56-344 (2d ed. 1976) (where cross-motions are based on different legal theories as to which different facts are relevant, one does not dispose of the other).

and the author, telling them what he had witnessed and enclosing a photograph.

Dr. Burke's letter and photograph were published in the August/September 1972 issue of *Natural History* and were read by a Professor Bernhard Grzimek of the University of Giessen in Frankfurt, Germany. In September 1973 Grzimek wrote to Burke saying,

"I hope that you have no objection that we print a German translation of your letter in our journal DAS TIER (THE ANIMAL). We also would like to get a copy of your pictures and, in case you have done several, of the other ones too.

"I personally would like to use the film which was done of this incident in my lectures at the university and in a television programme. Is this film still available. Was it done in colour? Would it be possible to get a copy of it on my expenses?"

Grzimek was a co-editor of Das Tier and the host of an educational program about animals broadcast on German public (non-commercial) television, and was known to Dr. Burke as such by reputation. Dr. Burke sent Grzimek the following reply, in relevant part:

"It is for me a great honour that you wish to translate my letter 'Incident in the Serengeti' into 'das Tier.' Naturally, I give you permission.

"The pictures and the film will be returned to me shortly, and as soon as I receive them I shall send them to you.

"The interesting film and the pictures are in colour. The film was taken with Super 8mm film and 18 frames per second, therefore I am not quite certain if the film is feasible for television-broadcasting. This I will leave to the technicians."

Burke did send his film and pictures to Grzimek who, as far as the record shows, made a 16mm copy of the movie, used the copy in his lectures and on public television in Germany, and returned to Burke the 8mm original. Dr. Burke stated in his affidavit that he "never gave anyone else permission to use [the] film for any purpose."

The events leading to the alleged copyright infringement began three years later, in November 1976, when Survival Anglia Limited (SAL), a British company specializing in nature films, wrote to Grzimek asking about the footage he had of a zebra attacking a lioness. Grzimek forwarded the film with a cover letter in which he said, "In the text must be mentioned that this shot was taken by an American visitor, [Dr. Burke]." The Executive Director of SAL thanked Grzimek for the film and wrote,

"We will make sure that a credit is given to Dr. Burke and will return a complete dupe master to you.

"Can you please let me know what we should do about paying Dr. Burke?"

In response, Grzimek wrote that he had paid Burke for some still photographs but not for the movie film, and that he "had the impression that [Dr. Burke] was quite happy that his film was used in television. If you want to contact him, his address is . . . . ."

SAL proceeded to use 33 feet of Burke's film in its production, "The Parenthood Game," without contacting Burke. NBC thereafter bought "The Parenthood Game" and broadcast it in this country between 8 and 9 p.m. on January 27, 1977. Only on February 14, 1977, did someone from SAL write to Burke telling him that his film had been used and saying,

"We have a letter from Prof. Grzimek telling us you are happy for your film to be used, but not mentioning any reimbursement.

"Could you please let me know what payment is due to you, and I will process this."

In reply, Dr. Burke denied that Grzimek had permission to release the film, asserted that he retained the copyright in the film, and requested reimbursement according to SAL's usual rates. To date, he has received nothing.

This action against NBC is based on a claim of common law copyright, Dr. Burke never having obtained a statutory copyright on his film. Because we find the case close, and because we are in disagreement with

the judgment below, we shall first review at some length the relevant legal principles.

■ At common law the creator of a literary or artistic work has the right to copy and profit from it, and can distribute or show it to a limited class of persons for a limited purpose without losing that right. The right continues until the creator allows a "general" publication of his work to occur; the work then passes into the public domain and, unless the creator has obtained a statutory copyright, anyone can copy, distribute or sell it for his own benefit. *Caliga v. Inter Ocean Newspaper Co.,* 215 U.S. 182, 188, 30 S.Ct. 38, 54 L.Ed. 150 (1909); *American Tobacco Co. v. Werckmeister,* 207 U.S. 284, 299, 28 S.Ct. 72, 52 L.Ed. 208 (1907).[2]

■ The common law recognizes three ways of exposing a work to the public: exhibition or performance, limited publication, and general publication. Of these, only general publication results in loss of the common law copyright by the creator.

■ Mere performance or exhibition of a work results, at common law, in no publication at all. *Ferris v. Frohman,* 223 U.S. 424, 435, 32 S.Ct. 263, 56 L.Ed. 492 (1912); *American Tobacco,* 207 U.S. at 300, 28 S.Ct. 72.[3] Under this principle, a film is not "published" if it merely is shown but the general public is not permitted to own—as opposed to borrow—tangible copies of. it. *E.g., Patterson v. Century Productions, Inc.,* 93 F.2d 489 (2d Cir. 1937), *cert. denied,* 303 U.S. 655, 58 S.Ct. 759, 82 L.Ed. 1114 (1938); *DeMille Co. v. Casey,* 121 Misc. 78, 201 N.Y.S. 20 (Sup.Ct.1923); *see* M. Nimmer, *Nimmer on Copyright* § 4.08[A], at 4–41–44 (1978) [hereafter *Nimmer on Copyright*]. Publication may be found if the circumstances suggest that the public was free to copy a work on exhibit, but a prohibition

against copying can be "tacitly understood" or implied. *American Tobacco,* 207 U.S. at 300, 28 S.Ct. 72.

■ A general publication occurs when a work is made available to members of the public at large without regard to who they are or what they propose to do with it. *See Public Affairs Associates, Inc. v. Rickover,* 109 U.S.App.D.C. 128, 136–37, 284 F.2d 262, 270–71 (1960), *vacated on other grounds,* 369 U.S. 111, 82 S.Ct. 580, 7 L.Ed.2d 604 (1962); *Jewelers' Mercantile Agency, Ltd. v. Jewelers' Weekly Publishing Co.,* 155 N.Y. 241, 49 N.E. 872 (1898); *Nimmer on Copyright* § 4.04, at 4–18–22. A general publication is such dissemination of the work itself among the public as justifies the belief that it has been dedicated to the public and rendered common property. *American Tobacco,* 207 U.S. at 300–01, 28 S.Ct. 72; *Patterson,* 93 F.2d at 492; *King v. Mister Maestro, Inc.,* 224 F.Supp. 101, 106 (S.D.N.Y.1963). It is said that courts have hesitated to find general publication if to do so would divest the common law right to profit from one's own work. *See Hirshon v. United Artists Corp.,* 100 U.S.App.D.C. 217, 221–23, 243 F.2d 640, 644–45 (1957); *American Visuals Corp. v. Holland,* 239 F.2d 740, 744 (2d Cir. 1956) (Frank, J.).

■ A general publication can be found where only one copy of the work passes to a member of the general public, as general publication depends on the author making the work available to those interested, and not on the number of people who actually express an interest. *Jewelers',* 49 N.E. at 875; *Nimmer on Copyright* § `4.13[A], at 4–67. Thus "[t]he common-law right is lost by the general publication or unrestricted sale of a single copy." *Bobbs-Merrill Co. v. Straus,* 147 F. 15, 19

---

**2.** Under the Copyright Act of 1976, 17 U.S.C. §§ 101 810, common law copyright is abolished. The Act does not affect rights with respect to causes of action that arose before January 1, 1978, however. 17 U.S.C. §§ 301(a), (b)(2).

**3.** The doctrine that performance is not publication has been criticized because it allows an artist to profit from his work indefinitely, con-

trary to the policies of the copyright statute, which limit the life of a statutory copyright. *E. g.,* B. Kaplan, *An Unhurried View of Copyright* 85 (1967). Under the Copyright Act of 1976, distribution of copies of films for television broadcast is publication, but broadcasting in itself is not. *See* 17 U.S.C. § 101; M. Nimmer, 1 *Nimmer on Copyright* § 4.11[B], at 4–55 (1978).

(2d Cir. 1906), *aff'd*, 210 U.S. 339, 28 S.Ct. 722, 52 L.Ed. 1086 (1908). Thereafter, a copyright can be preserved only by timely compliance with the copyright statute. In at least two cases involving a dispute over whether a statutory copyright existed, the sale of a single copy of a written work has been held to constitute publication such as to require compliance with or invoke the protection of the copyright statute. *Gottsburger v. Aldine Book Publishing Co.*, 33 F. 381 (D.Mass.1887); *Atlantic Monthly Co. v. Post Publishing Co.*, 27 F.2d 556 (D.Mass. 1928).

■ A "limited publication," by contrast, occurs when tangible copies of the work are distributed, but to a limited class of persons and for a limited purpose. One frequently quoted formulation of this concept is that a limited publication,

> "communicates the contents of a [work] to a definitely selected group and for a limited purpose, . . . without the right of diffusion, reproduction, distribution or sale . . . [T]he circulation must be *restricted both as to persons and purpose,* or it cannot be called a private or limited publication."

*White v. Kimmell,* 193 F.2d 744, 746–47 (9th Cir. 1952) (emphasis added). While the distribution must be so restricted, however, the restrictions can be implied as well as express. *Werckmeister v. American Lithograph Co.,* 134 F. 321, 324 (2d Cir. 1904).

The distinction between "general" and "limited" publication is one of degree, and depends less on the creator's intentions than on his actions. *See Rickover,* 109 U.S.App. D.C. at 136, 284 F.2d at 270; *National Comics Publications, Inc. v. Fawcett Publications, Inc.,* 191 F.2d 594, 598 (2d Cir. 1951); *King,* 224 F.Supp. at 103. In cases where general publication has been found, the creator had made his work available in a manner that suggested that any interested person could have a copy. *See Nimmer on Copyright* § 4.04, at 4–20–21. Thus in *Rickover, supra,* copies of Admiral Rickover's speeches had been given to the press, sent to individuals both on request and without solicitation, and sent in batches of 50 to sponsors for distribution. 109 U.S.App.D.C. at 137, 284 F.2d at 271. In short, "Anyone was welcome to a copy." *Id.* General publication was also found in *White v. Kimmell, supra,* 193 F.2d 744: the author of a manuscript had distributed copies to friends, acquaintances and strangers, telling many to pass them on and authorizing some to make additional copies, provided they did not distribute the manuscript "in published form." 193 F.2d at 745–47. The recipients were not members of any group or association, and the author set no limitations on the number of copies to be made or on the persons to receive them—"a mere request" apparently sufficed to obtain one. 193 F.2d at 747. In *American Visual, supra,* 239 F.2d 740, the plaintiff had placed copies of his brochures on a table in a hotel where an insurance industry convention was being held, and had given additional copies to an insurance association for distribution to its member companies. The court found that, while the plaintiff had a limited purpose in distributing the work, no limitation was placed on the persons who could obtain copies, either from the hotel table or from the insurance association's member companies. *Id.* at 744.

Mere limited publication has been found where the range and purpose of distribution did not suggest that the general public was free to obtain and use the work. Thus in *Patterson, supra,* 93 F.2d 489, the court found no general publication despite the fact that copies of the film in issue were circulated widely; the copies were sent only to non-profit groups to be shown for noncommercial purposes, with no authorization to copy them further and, apparently, with the understanding that they would be returned. In *King, supra,* 224 F.Supp. 101, the district court held that the Rev. Martin Luther King's speech, "I Have a Dream," was not in the public domain. "Advance copies" of the text were given to the press, and excerpts were later broadcast on national television and used in movie house newsreels. Although countless people heard and saw the speech given, the oral delivery was mere performance, not publi-

cation. *Id.* at 106–07. Publication occurred when the text was given to the press, but was "limited" rather than "general"—tangible copies were given only to a specific group to assist it in covering the event, and were never offered to the public at large. *Id.* at 107.[4] In *Allen v. Walt Disney Productions, Ltd.,* 41 F.Supp. 134 (S.D.N.Y. 1941), the composer of a song—"Old Eli March"—had loaned manuscripts thereof to various musicians, and had sent a copy to two different music companies. No copies had been sold, however, and the composition was not printed until 1936—almost thirty years after it was written. The court found that no general publication occurred until 1936, noting that there was "no general offer or dedication to the public." *Id.* at 136. Similarly, in *McCarthy & Fischer, Inc. v. White,* 259 F. 364 (S.D.N.Y.1919) (A. Hand, J.), a composer had given a copy of his song to a singer for performance, but had not dedicated it to the public: "It was not . . . a [general] publication to give the song to a limited number of artists to sing . . . . There [was] no evidence or probability that any of the copies were sold, or that they were given out for any purpose but a limited use by a few vaudeville artists." *Id.* at 365.

■ The parties in the present case have called our attention to no decision that fits precisely the circumstances surrounding Dr. Burke's release of his film to Dr. Grzimek. In light of the principles and precedents just reviewed, however, we conclude that the district court erred in finding that a general publication occurred.

The district court thought that, when Dr. Burke voluntarily sent the film to Germany knowing that it would be copied and used on German television, "he did not expressly or impliedly restrict it either as to persons or purposes." In the court's view, Burke's letter of September 1973 "placed no restrictions on the persons who could view the film, nor . . . upon the purposes for which it could be shown."

As performance in itself is not publication, the fact that Dr. Burke knew the film would be copied by Dr. Grzimek and used in his lecture or on television was not determinative. Publication did not occur merely because the film was shown to the general public. *See Patterson, supra,* 93 F.2d 489. The decisive issue was whether Burke's release of the film itself to Dr. Grzimek was, under the circumstances, a general publication. We find that it was not.

Dr. Burke sent the film to Dr. Grzimek in response to a request to have a copy to use personally in lectures and on a television program. Dr. Grzimek made a copy, apparently for his own use, but this was the extent of the copying and distribution authorized at that time. As Dr. Burke knew, Dr. Grzimek was a professor and hosted an educational program on non-commercial television. Allowing the film to be used for the purposes requested was not a blanket authorization to use it for any purpose, much less to release it to a commercial producer. True, Dr. Burke did not state explicitly in his letter that Dr. Grzimek could not distribute copies of the film to others, or use it for other purposes, but we think such limitations are reasonably to be implied: Dr. Grzimek made a specific request to use the film for a specific purpose, and Dr. Burke's affirmative response cannot be thought to have authorized any further use or other purpose.

This is not a case like *Rickover, supra,* 109 U.S.App.D.C. 128, 284 F.2d 262, *White v. Kimmell, supra,* 193 F.2d 744, or *American Visuals, supra,* 239 F.2d 740, where the owners distributed copies of their work in a way that made them available to the general public. That Dr. Burke was "honored" by Dr. Grzimek's request and readily agreed to it seems a function of Dr. Grzimek's stature as a naturalist, and is consistent with believing Dr. Grzimek would use the film only for his own stated purposes. Burke states in his affidavit that he never made the film available to anyone else—

---

4. The result in *King* has been questioned on the ground that the distribution of the speech to the press was for ultimate dissemination to the

general public. *Nimmer on Copyright* § 4.13[A], at 4–66 n.11.

there is thus no evidence of a practice of releasing copies on demand. Nor is this a case in which the recipient was directly or impliedly invited to put the film to any use he wished. Dr. Grzimek had no reason to suppose that he was free to distribute copies of the film at will, or to license its commercial use. We find that only a "limited" publication occurred, and that Dr. Burke's common law copyright was not lost.

The judgment below is reversed. As there remain no disputed facts on the question of liability, the case is remanded so that appellant's cross-motion for summary judgment may be granted. 6 J. Moore, *Federal Practice* ¶ 56.13 at 56–348–49 (2d ed. 1976). The case is also remanded for disposition on the issue of damages.

*So ordered.*