**ESTATE OF MARTIN LUTHER KING, JR., INC., Plaintiff,**

v.

**CBS, INC., Defendant.**

**Civil No. 1:96cv3052WCO.**

United States District Court,
N.D. Georgia,
Atlanta Division.

July 22, 1998.

Joseph M. Beck, William Howard Brewster, Miles J. Alexander, Stephen F. Humphreys, of Kilpatrick Stockton, Atlanta, GA, for Plaintiff.

Bruce Perrin Brown, Steven Paul Smith, of Long, Aldridge & Norman, Atlanta, GA, Anthony M. Bongiorno, of CBS, Inc., New York City, Floyd Abrams, of Cahill, Gordon & Reindel New York City, for Defendant.

## ORDER

O'KELLEY, Senior District Judge.

The captioned case is before the court for consideration of defendant's and plaintiff's cross-motions for summary judgment, [32–1] and [34–1] respectively, and plaintiff's motion to exclude improperly withheld evidence [43–1].

### Facts

This case is a copyright infringement suit brought by plaintiff, Estate of Martin Luther King, Jr., Inc. ("the Estate"), against defendant CBS, Inc. ("CBS"). At issue is Dr. King's "I Have a Dream" speech ("the Speech") delivered during the August 28, 1963 March on Washington ("the March") in front of the Lincoln Memorial.

The March was organized by the Southern Christian Leadership Conference ("SCLC") and nine other national organizations. Events of the day, including Dr. King's speech, were seen and heard by some 200,000 people gathered at the March and were broadcast live by CBS and other major television networks and radio stations.[1] The wide press coverage occurred pursuant to the express invitation of the March organizers.[2] An advance text of Dr. King's speech was available in the press tent; no copyright notice appeared on the text or was asserted concurrent with the giving of the speech. CBS contends that there were no restrictions regarding entry into the press tent and that individuals outside of the press entered the area and obtained copies of the day's speeches. The Estate argues that Dr. King furnished this advance text for the sole purpose of assisting press coverage of the March and that he had been assured that it would be available only to the press. The Estate points out that the advance text differed significantly from the speech as actually delivered. The speech itself contained 682 words not included in the advance text, and the CBS episode included approximately 90% of the addition.

Following the March, the SCLC reprinted the speech in its entirety in its September 1963 newsletter with no copyright notice or other restrictions. The newsletter bore Dr. King's name and title as President at the top of its masthead. Generally, the SCLC newsletter had a large national circulation and was also sent to those who asked for copies.

---

1. Several of CBS's statements in its Statement of Undisputed Material Facts set forth particulars of the March, such as numbers of marchers and newsmen attending, networks covering the event, and numbers of television viewers. (Defendant's Statement of Material Facts, ¶¶ 6, 16, 25.) In its response, the Estate does not deny the numbers and details asserted by CBS but instead asserts that these are not relevant or material facts. (Plaintiff's Response to Defendant's Statement of Material Facts, ¶¶ 6, 16, 25.) The court disagrees. LR 56(B)(2) provides: "All material facts contained in the moving party's statement which are not specifically controverted by the respondent in respondent's statement shall be deemed to have been admitted." Exact numbers are unimportant, but the court has little trouble with accepting the undenied fact that the March was attended by approximately 200,000 marchers and that Dr. King's speech was broadcast live to millions.

2. CBS asserted the March organizers' efforts to recruit press coverage in its Statement of Undisputed Material Facts. (Defendant's Statement of Material Facts, ¶¶ 19) ("The organizers of the March actively sought to secure maximum national television coverage.") In its response, the Estate does not deny CBS's statement but contends that the media's interest in covering the March is immaterial and irrelevant. (Plaintiff's Response to Defendant's Statement of Material Facts, ¶ 19.) The court finds this response by the Estate to be as unresponsive as that discussed in footnote 1, *supra*. CBS was not focusing on the media's interest in their statement, and neither is this court in its opinion. The concentration is instead on what the organizers of the March and those affiliated with Dr. King sought by way of coverage. The court again refers plaintiff to LR 56(B)(2). *See* note 1, *supra*.

Martin Luther King, Jr. applied for statutory copyright for the Speech on September 30, 1963, after the events described, *supra*.[3] Four days later, on October 4, 1963, Dr. King brought a lawsuit to enjoin the sale of unauthorized recordings of the speech. *See King v. Mister Maestro, Inc.*, 224 F.Supp. 101 (S.D.N.Y.1963). The district court in that case granted an injunction, holding that Dr. King's public delivery of the speech and the advance text given to the press did not amount to a general publication such as to prevent copyright protection for the literary work. *Id.* at 107.

In 1994, CBS signed a contract with Arts & Entertainment Network ("A & E") to produce an historical documentary series entitled "The 20th Century With Mike Wallace." The documentary was broadcast and sold as a box set by A & E. One segment was dedicated to "Martin Luther King, Jr. and The March on Washington." Much of the episode contained material filmed by CBS during the March, including footage of the speech as it was delivered that day before some 200,000 people. Approximately 60% of Dr. King's speech was included verbatim in the episode. Dr. King's words are heard while a photo and video montage show scenes of the crowd, of Dr. King delivering his speech, and of various instances of discrimination leading up to the civil rights movement. The majority of the episode contains CBS's footage of other speeches and events during the civil rights movement, modern interviews discussing the historical impact of certain events, and narration by Mike Wallace.

## Legal Analysis

### I. *Plaintiff's Motion to Exclude*

■ In dispute in plaintiff's motion to exclude are certain documents gathered from public libraries and collections by CBS's attorneys for use in this litigation. CBS asserted a work product privilege as to these documents and withheld all but those it utilized in support of its motion for summary judgment. The documents at issue were not created by CBS personnel or maintained in CBS files or facilities but are historic third-party documents. Those documents which CBS relied on in its summary judgment mo-

tion were released after the close of discovery and shortly before the deadline for filing summary judgment motions.

The Estate contends that these documents were responsive to earlier discovery requests. The Estate further argues that CBS did not properly assert the work product privilege, in that it failed to provide a log describing the nature of the documents. CBS counters that it timely asserted an appropriate work product defense. CBS also points out that these documents were equally available to the Estate (and suggests that many of them are even located in the King Center itself) and that the Estate is, therefore neither prejudiced by CBS's assertion of privilege nor in substantial need of the documents. In addition, CBS offered the Estate additional time in which to conduct its own research or to prepare its summary judgment motion. CBS argues that it should not have to throw open its files of costly factual research gathered in support of its affirmative defenses.

The court agrees that CBS's work product privilege was appropriately asserted in this context. The Estate's motion to exclude the documents which CBS produced in conjunction with its summary judgment motion is therefore DENIED.

### II. *Cross–Motions for Summary Judgment*

The Estate argues that it should be awarded summary judgment as to its infringement claim and also as to CBS's affirmative defenses. CBS's cross-motion contends that summary judgment should be granted as to its claim that Dr. King was divested of his rights when he placed the speech in the public domain without copyright notice and also as to CBS's defense that its use was protected by the First Amendment and the doctrines of fair use and implied license.

#### A. *Summary Judgment Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and

---

**3.** The copyright was renewed by the King family in 1991.

that the moving party is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(c). Only those claims for which there is no need for a factual determination and for which there is a clear legal basis are properly disposed of through summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

It is well settled that a court considering a motion for summary judgment must view the evidence in a light most favorable to the non-moving party. *See, e.g., Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir.1988); *Tippens v. Celotex Corp.*, 805 F.2d 949, 952 (11th Cir.1986), *reh'g denied*, 815 F.2d 66 (11th Cir.1987). It is important to recognize, however, that this principle does not require the parties to concur on every factual point. Federal Rule of Civil Procedure 56 "[b]y its very terms ... provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–8, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). The governing standard as to which facts are material is the relevant substantive law in the case. *Id.* at 248, 106 S.Ct. 2505. Thus, the "threshold inquiry [is to determine] whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505. Having set forth the proper legal framework in which to analyze the parties' motions for summary judgment, the court now proceeds to the case *sub judice*.

### B. *Infringement*

A plaintiff suing for infringement of a copyright must prove two elements: ownership of the copyright by the plaintiff and copying of the work by the defendant. *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1541 (11th Cir.1996). Once the plaintiff produces a certificate of copyright, the defendant can attempt to demonstrate that the copyright claim is invalid. *Id.*

Dr. King applied for statutory copyright on September 30, 1963, and the copyright was renewed by the King family in 1991. Although CBS admitted during the January 16, 1998 summary judgment hearing that it used approximately 62% of the speech in its documentary, it contends that prior to seeking any copyright, the speech was placed into public domain. Therefore, CBS argues, the Estate does not have a valid copyright in the speech.

■ The Copyright Act of 1909 as amended applies to the question of registerability in this case because Dr. King's speech occurred prior to the effective date of the Copyright Act of 1976. *See Norris Indus., Inc. v. Int'l Tel. & Tel. Corp.*, 696 F.2d 918, 920 (11th Cir.1983). State common law protection begins with a work's creation and continues until its publication. At this point common law protection is lost, and the owner can secure federal protection by complying with legislative requirements. If he does not do so, the owner's common law protection is lost, and the published work is considered to be in the public domain. *Donald Frederick Evans & Assocs., Inc. v. Continental Homes, Inc.*, 785 F.2d 897, 905 (11th Cir.1986); *Roy Export Co. v. CBS, Inc.*, 672 F.2d 1095, 1101 (2d Cir.1982). This occurs regardless of the owner's intent. *Brown v. Tabb*, 714 F.2d 1088, 1092 (11th Cir.1983) (*quoting Data Cash Systems, Inc. v. JS&A Group, Inc.*, 628 F.2d 1038, 1043 (7th Cir.1980)).

Although the 1909 Act does not itself contain a definition of publication, the Copyright Act of 1976 effectively codified the definition which had evolved through case law. *See* 1 Nimmer, Copyright, § 4.04, at 20.

> [P]ublication occurs when by consent of the copyright owner, the original or tangible copies of a work are sold, leased, loaned, given away, or otherwise made available to the general public, or when an authorized offer is made to dispose of the work in any such manner even if a sale or other such disposition does not in fact occur.

*Id.* (footnotes omitted); *Brown v. Tabb*, 714 F.2d at 1091 (*quoting* Nimmer). Offering to distribute copies of a work for purposes of further distribution, public performance, or

public display also constitutes publication. 17 U.S.C. § 101 (1996).

A distinction between general and limited publication has been created by case law which holds that only the former operates to divest a work of common law copyright and to subject it to the federal statutory scheme. *Brown v. Tabb,* 714 F.2d at 1091. "A general publication occur[s] when a work [i]s made available to members of the public at large without regard to their identity or what they intend[ ] to do with the work." *Id.* (*citing Burke v.. NBC, Inc.,* 598 F.2d 688, 691 (1st Cir.1979)). *See also American Vitagraph, Inc. v. Levy,* 659 F.2d 1023, 1026 (9th Cir.1981) (*quoting American Tobacco Co. v. Werckmeister,* 207 U.S. 284, 299–300, 28 S.Ct. 72, 52 L.Ed. 208 (1907)) (general publication occurs when there is "such a dissemination of the work of art itself among the public, as to justify the belief that it took place with the intention of rendering such work common property."). A limited publication is one "which communicates the contents of a [work] to a definitely selected group and for a limited purpose, without the right of diffusion, reproduction, distribution or sale." *Intown Enters., Inc. v. Barnes,* 721 F.Supp. 1263, 1265 (N.D.Ga.1989) (*quoting* 1 Nimmer § 4.13[A], at 72).

At issue here is whether the public delivery of Dr. King's speech, along with the advance text to the press and the printing of the speech in the SCLC newsletter, constituted a general publication of the speech so as to place it in the public domain.

Ordinarily the public performance of a work is not in itself regarded as a publication. 17 U.S.C. § 101. Case law distinguishes between the performance of a work and other means of dissemination. *See American Vitagraph,* 659 F.2d at 1027; *Burke v. NBC, Inc.,* 598 F.2d at 691. CBS argues that because of the overwhelmingly public nature of the speech and the fervent intentions of the March organizers to draw press attention, the ordinary protection granted to public performances should not apply. This court is inclined to agree that the circumstances in this case take the work in question outside the parameters of the "performance is not a publication" doctrine.

In an oft-cited Supreme Court case discussing the idea of performance as publication, *Ferris v. Frohman,* 223 U.S. 424, 32 S.Ct. 263, 56 L.Ed. 492 (1912), the court held:

> The public representation of a dramatic composition, not printed and published, does not deprive the owner of his common-law right, save by operation of statute. At common law, the public performance of the play is not an abandonment of it to the public use.... "So, where a dramatic performance has been allowed by the author to be acted at a theater, no person has a right to pirate such performance, and to publish copies of it surreptitiously; or to act it at another theater without the consent of the author or proprietor; for his permission to act it at a public theater does not amount to an abandonment of his title to it, or to a dedication of it to the public at large."

*Id.* at 435–36, 32 S.Ct. 263 (*quoting* 2 Story, Eq. Jur. § 950). However, the case *sub judice* quite a different factual scenario from that confronted in *Ferris v. Frohman,* in which it was held that the performance of a play did not destroy common law copyright. A closer situation would be presented if the owner of the common law right to the play in *Fromer v. Ferris* had not only allowed the performance of his play but also had invited the press to attend, film, broadcast it live on numerous television and radio stations, and replay parts on news programs, and *then* the owner had sought and selectively asserted statutory copyright protection. The court does not believe that such inconsistent actions, as occurred in the captioned case, can be seen as anything other than a general publication extinguishing common law copyright protection.

The concept that dissemination by performance could reach such heights as to be a publication is not a new one. As the court in *International Tape Manufacturers Association v. Gerstein* commented:

> Clearly, the limited dissemination of a work by performance does not constitute a publication of that work sufficient to deprive the owner of his common law copyright. Equally clearly, at some point, the nature of the dissemination by perfor-

mance is so great as to deprive the owner of his common law copyright in the underlying work, and constitute an abandonment of the right to reproduce the performance. The difficulty arises in determining whether the publication in each case constituted a "general publication" or a "limited publication."

344 F.Supp. 38, 56–57 (S.D.Fla.1972), *vacated,* 494 F.2d 25 (5th Cir.1974). *See also Burke v. NBC, Inc.,* 598 F.2d at 691; *Silverman v. CBS, Inc.,* 632 F.Supp. 1344, 1353 (S.D.N.Y.1986).

The size of the audience before which a work is performed cannot be the basis for a court's finding that a general publication has occurred. *See Brown v. Tabb,* 714 F.2d at 1091 (holding that the number of persons receiving copies is not determinative). Likewise, common law copyright is not placed in jeopardy based on the importance or newsworthiness of the public figure or material at issue. *Harper & Row Publishers, Inc. v. Nation Enter.,* 471 U.S. 539, 558–59, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). Instead, it is the actions (and corresponding failures to act) by owners and proprietors which can divest a work of common law copyright protection.

Attitude toward reproduction of the work is a critical factor which surfaces in the examination of the legal effect on common law copyright protection by a performance, such as that of Dr. King's speech at the March. A publication can hardly be considered "limited" when it carries with it the right of reproduction or distribution, as was the case here. *See White v. Kimmell,* 193 F.2d 744, 747 (9th Cir.1952); *Burke v. NBC, Inc.,* 598 F.2d at 691 ("[p]ublication may be found if the circumstances suggest that the public was free to copy a work on exhibit"). Although merely showing the general public a work through a public performance or exhibition is not necessarily a general publication, such action is treated as a general publication if it is shown to the·public under such conditions that it evinces a "dedication without reservation of rights" rather than just the right to view or inspect. *Silverman,* 632 F.Supp. at 1353 (*citing American Tobacco Co.,* 207 U.S. at 299, 28 S.Ct. 72). The negative implication of this concept is underscored in cases which emphasize the unlawfulness of record-ing without consent a performance which is not a general publication and is therefore covered by common law copyright protection. *See Ferris v. Frohman,* 223 U.S. at 435, 32 S.Ct. 263; *RCA Mfg. Co. v. Whiteman,* 114 F.2d 86, 88 (2d Cir.1940) ("if a conductor played over the radio, and if his performance was not an abandonment of his rights, it would be unlawful without his consent to record it as it was received from a receiving set and to use the record").

Obviously, the March organizers were aware of and encouraged the press' coverage of the March. *See* Plaintiff's Responses to Defendant's Statement of Material Facts ¶ 29 ("Plaintiff admits Dr. King and Plaintiff have no objection to CBS coverage of the MARCH ON WASHINGTON, including using the speech for purposes of reporting a contemporary news event.").

Another crucial factor in this court's consideration is the studied effort by March organizers to secure as wide dissemination of the March's speeches as possible. *See Public Affairs Assoc., Inc. v. Rickover,* 284 F.2d 262, 271 (D.C.Cir.1960), *vacated on other grounds,* 369 U.S. 111, 82 S.Ct. 580, 7 L.Ed.2d 604 (1962) (holding that publication occurred because of the utter lack of effort to limit distribution). Dissemination of the speakers' words to the greatest public audience possible was one goal of the March organizers. *See* Barrett Aff. Exhs. 7, 8, 11, 13. The press was invited to attend and to film the day's events. *See* note 2, *supra.* Dr. King provided the press with an advance text of his speech to enable them to film and broadcast the events more easily. *See* Plaintiff's Response to Defendant's Statement of Material Facts, ¶ 17 (King furnished the advance text "for the express limited purpose of assisting the coverage of said March"). The March was broadcast live on multiple television networks and radio stations, and portions, including Dr. King's speech, were subsequently re-broadcast.

At no point was the press given express limitations regarding who could film the event or the extent to which their footage could be used. *See White v. Kimmell,* 193 F.2d at 747 (not a limited publication because no limits were placed on what recipients did

with the work). Prohibitions on reproduction and other restrictions can be tacitly understood or implied, *Burke v. NBC, Inc.,* 598 F.2d at 691; however, there is no indication that any such limitations were made or implied.[4] Furthermore, there is no record of objections by Dr. King or by other March participants or organizers as to the press' coverage of the event. *See Continental Homes,* 785 F.2d at 908 (noting that the copyright owner's awareness of the publication coupled with acquiescence rather that objection constituted implicit authorization for the publication).

Dr. King's speech at the March almost epitomizes the definition of a general publication: it was made available to members of the public at large without regard to who they were or what they proposed to do with it. *See Burke v. NBC, Inc.,* 598 F.2d at 691. The dissemination justified CBS's belief that Dr. King's speech was dedicated to the public. *See American Tobacco Co.,* 207 U.S. at 300–301, 28 S.Ct. 72.

The Estate argues that Dr. King did not intend his rendering the speech to be a publication and had every intention of protecting his legal rights to the speech. However, the court looks only at "what he intended to do rather than at what he intended to be the legal consequence of his acts." *Brown v. Tabb,* 714 F.2d at 1092; *White v. Kimmell,* 193 F.2d at 747.

The Estate relies heavily on *King v. Mister Maestro, Inc.,* the case in which a preliminary injunction was granted to Dr. King to stop a defendant from selling phonograph records of his speech. In that case the court held that Dr. King's public delivery of his speech did not amount to a general publication of his work and that the advance text was only a limited publication. As CBS points out, this ruling from the Southern District of New York is in no way binding precedent on this court, and the preliminary injunction standard is disparate from the summary judgment standard. However, this court will not attempt to evade the reality that it is reaching a disparate conclusion based on what are essentially the same circumstances.[5] The court in *Mister Maestro* considered the same issue that this court bases its holding on today:

> Defendants stress the public nature of the delivery of the speech by Dr. King—the enormous crowd, the radio and television broadcasts, the movie newsreel pictures. The question is: was this a general publication of the speech so as to place it in the public domain?

224 F.Supp. at 106. That court answered the question in the negative; today this court pronounces its disagreement. This court does not believe that the circumstances surrounding Dr. King's speech can sustain the assertion that it was merely an "oral delivery" and not a general publication which rendered an end to common law copyright protection.[6] Quite the opposite: as one of the most public and most widely disseminated speeches in history, it could be the poster child for general publications. Diverging

---

**4.** In its Response to Defendant's Statement of Material Facts, the Estate argues that "the circumstances surrounding delivery of the speech clearly implied that members of the press, including CBS, could only use the speech for the purposes of reporting a contemporary news event." (Response, ¶ 28.) The Estate fails to articulate any facts which support this conclusion. *See* LR 56(B)(1) ("Statements in the form of issues or legal conclusions (rather than material facts) will not be considered by the court.").

**5.** It appears that in reaching its decision the court in *Mister Maestro* did not have the benefit of some potentially important information with which this court has been presented: (1) the SCLC newsletter containing a reproduction of the whole of Dr. King's speech was not introduced, and (2) that court was not presented with anything "to suggest that copies of the speech were ever offered to the public...." *Mister Mae-*

*stro,* 224 F.Supp. at 107 ("the fact is clear that the 'advance text' was given to the press only"). However, material facts are in dispute as to whether the use of Dr. King's speech in the newsletter was authorized and also as to the actual availability of the advance text. Accordingly, for the purposes of summary judgment, this court does not rest its holding upon the newsletter or the advance text but upon the context of Dr. King's speech itself.

**6.** This court has no doubt that the court in *Mister Maestro* was well-intentioned. As that court noted, it may seem "unfair and unjust for defendants to use the voice and the words of Dr. King" for their own profit. *See* 54 U.Chi.L.Rev. 590, 647 (noting that cases such as *Mister Maestro* illustrate that under the 1909 Act, courts "struggled to find" that certain disseminations were too limited to trigger a publication).

**1354**

from the holding in *Mister Maestro*, this court follows the path taken by the court in *Letter Edged in Black Press, Inc. v. Public Bldg. Comm'n of Chicago,* 320 F.Supp. 1303 (N.D.Ill.1970). In that case, the court found that the Commission had lost common law copyright protection by publication without the requisite notice of a monumental sculpture donated by Picasso. The Commission had held press showings and allowed newspapers and magazines to take and publish photographs. As in the case *sub judice,* the court in *Letter Edged in Black Press* found that publication occurred not because of the public exhibition but largely because of the Commission's lack of restriction on copying and its free allowance of reproduction by the press. *Id.* at 1309. As the court remarked, "Were this activity classified as limited publication, there would no longer be any meaningful distinction between limited and general publication." *Id.* at 1311.

It would be equally incongruous to observe the context and circumstances surrounding Dr. King's speech and find that a general publication had not occurred. Accordingly, this court holds that while performance itself may not be sufficient to constitute publication, performance coupled with such wide and unlimited reproduction and dissemination as occurred concomitant to Dr. King's speech during the March on Washington can be seen only as a general publication which thrust the speech into the public domain.

### Conclusion

In accordance with the above discussion, the court hereby GRANTS defendant's motion for summary judgment [32–1] and DENIES plaintiff's motion to exclude [43–1] and plaintiff's motion for summary judgment [34–1].