COOK, Senior District Judge, concurring in part and dissenting in part:
I concur in the result that was reached by my distinguished colleague, Chief Judge Anderson. Nevertheless, I write separately to express my own thoughts about this very complicated area of the law. To summarize, I agree with the proposition that this case is controlled by the 1909 Copyright Act, under which Dr. King did not lose copyright protection over his “I Have A Dream Speech” by placing it into the public domain based on the factors considered below. However, my reading of the law leads me to believe that a distinction between works that are performed and those that are not is crucial to a proper resolution of this dispute. I will attempt to explain my rationale, as well as the ramifications that flow from it.
Additionally, I agree with Chief Judge Anderson that the remaining issues that have been raised by the parties but not ruled upon by this Court in this appeal are not appropriate for an appellate ruling.[1]
*1221 The district court held that a general publication had occurred on the basis of the combined presence of three factors; namely, (1) the performance of the speech by Dr. King during the March on Washington, (2) its contemporaneous wide dissemination by the press, through the broadcasting and print media, which resulted from the concerted efforts of the March organizers to gain media attention, and (3) the lack of restrictions, explicit, implicit, or in practice, on the copying or reproduction of the speech by the press or public. See Estate of Martin Luther King, Jr., Inc. v. CBS, Inc., 13 F.Supp.2d 1347, 1353 (N.D.Ga.1998) [hereinafter King 77]. While agreeing with Chief Judge Anderson that the speech was not placed into the public domain on the basis of these factors, I do not reach this conclusion because of the limited publication rule. Rather, I rely upon the more fundamental principle that, in the context of performed works, none of these factors may be properly considered as having contributed to a general or limited publication in the absence of an authorized dissemination of a tangible copy of the work without copyright notice.
A.
In my opinion, the trial court erred by holding that Dr. King’s performance of the speech was a factor which contributed to a general publication. The long-standing, well-understood, and accepted rule in copyright law is that performance does not constitute publication. See Ferris v. Frohman, 223 U.S. 424, 434-36, 32 S.Ct. 263, 56 L.Ed. 492 (1912); see also 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 4.08[A] (1998); 1 William F. Patry, Copyright Law and Practice at 417-18 (1994); 18 Am.Jur.2d Copyright and Literary Property § 13 (1985). This was the rule under state common law.
The public representation of a dramatic composition, not printed and published, does not deprive the owner of his common-law right, save by operation of statute. At common law, the public performance of the play is not an abandonment of it to the public use.
Ferris, 223 U.S. at 435, 32 S.Ct. 263. This principle was also applied to the 1909 Act by the courts, and was eventually codified in the 1976 Act. See Nimmer on Copyright § 4.08[A] & n.l; 17 U.S.C. § 101; see American Vitagraph, Inc. v. Levy, 659 F.2d 1023, 1028 (9th Cir.1981).
Inasmuch as the 1976 Act simply adopts the performance rule that existed under state common law and the 1909 Act, any reference to its provisions conclusively establishes that Dr. King’s oration of his “I Have A Dream” speech should not be construed as contributing to a divestive publication.
“Publication” is the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorec-ords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication. A public performance ... of a work does not of itself constitute publication.
17 U.S.C. § 101 (emphasis added). Further,
[t]o perform ... a work “publicly” means-
(1) to perform ... it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or
(2) to transmit or otherwise communicate a performance ... of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.
*1222 Id. Dr. King’s performance of the speech in the presence of over 200,000 individuals who had assembled for a demonstration at the Lincoln Memorial falls squarely within subclause (1) above, while the transmission of his speech by radio and television meets the criteria in subclause (2).
Moreover, consistent with the rationale behind the rule that performance is not a publication, I would hold that, for those controversies that are governed by the 1909 Act, neither a general nor a limited publication can ever occur merely from performance in the absence of an authorized distribution of a tangible copy of the work without a copyright notice or reservation of rights. Under the 1909 Act, a statutory copyright over a performed work could be obtained by two methods, each of which required the existence of a tangible copy. See Hirshon v. United Artists Corp., 243 F.2d 640, 644 (D.C.Cir.1957). Section 9 of the 1909 Act[2] provided that a copyright claim could be secured by affixing a notice to the tangible copies that were published or offered for sale.[3] On the other hand, if a performed work, such as a speech or musical or dramatic composition, had not been “reproduced in copies for sale,”[4] § 11 of the 1909 Act permitted an author to gain statutory copyright protection only by depositing a tangible copy with the Copyright Office.[5] Due to their peculiar nature, there were too many cases in which the requirement under the 1909 Act (to wit, that a tangible copy must exist before statutory copyright protection could be obtained) was unrealistically onerous for performed works because of the common necessity to make last minute revisions to plays, or, as this case exemplifies, speeches.[6] See 1 Nimmer on Copyright § 4.08[B], The 1909 Act appears to have recognized this problem, as § 2 (emphasis added) specified that “[n]othing in this title shall be construed to annul or limit the right of the author or proprietor of an unpublished work, at common law or equity, to prevent the copying, publication, or use of such unpublished work without his consent, and to obtain damages therefor.” Thus, § 2 recognized an absolute need for the strict adherence to a rule that, in the absence of a published tangible copy, a performance alone would never constitute a publication. Otherwise, an author could lose all copyright protection because of his inability to comply with the tangible copy requirement prior to the performance that was necessary to transform his common law copyright into a statutory copyright under § 11 of the 1909 Act.
Therefore, it is my view that the trial court erred by failing to recognize the special nature of performed works such as speeches which was recognized by the principle under the common law and the 1909 Act that performance does not constitute publication in the absence of an authorized distribution of tangible copies without a copyright notice or a reservation of rights.[7] “[Wjhatever the sufficiency of the rationale, whatever the bearing of pragmatic considerations, the law was clear prior to 1978, and remains clear that performance is not publication.” 1 Nimmer on Copyright § 4.08[B]. Consequently, I would reverse because the trial court relied upon Dr. King’s performance of the *1223 speech to conclude that a general publication had occurred.
B.
The trial court ruled that the widespread dissemination of the speech, which was due in large measure to the efforts of the March organizers, supported the conclusion that it had been placed into the public domain. In my opinion, this reasoning is incorrect because the size of the audience before whom a work is performed is irrelevant to the issue of publication.
A conclusively established corollary to the rule, which prescribes that performance does not constitute a general publication, is the principle that the size of an audience before whom an unpublished work is performed is irrelevant to the issue of publication. Again, a return to the 1976 Act, which as to performance merely codified the prior copyright law that had existed under state common law and the 1909 Act, is informative. “[P]erformances ... for example — [are] not a publication no matter how many people are exposed to the work.” H.R.Rep. No. 94-1476, at 138 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5754. “Oral delivery of a speech does not constitute a publication thereof regardless of a vast national audience via television and radio.” Nimmer on Copyright § 4.08[A],
In holding that dissemination by performance could be so widespread as to constitute a general publication, the trial court relied upon International Tape Mfrs. Ass’n v. Gerstein, 344 F.Supp. 38, 56-57 (S.D.Fla.1972), vacated 494 F.2d 25 (5th Cir.1974). See King II, 13 F.Supp.2d at 1351-52. I have doubts about whether Gerstein provides a sufficiently compelling authority upon which to base a ruling because it is questionable whether a vacated decision is a proper authority for prece-dential support. See Los Angeles County v. Davis, 440 U.S. 625, 634 n. 6, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979) (Supreme Court decision vacating judgment of Court of Appeals deprives opinion of lower appellate court of precedential effect). This is especially so inasmuch as the case was vacated on ripeness grounds. In Gerstein, the Court of Appeals was critical of the “abbreviated nature of the proceedings below” where “[t]he trial court had held no hearing, had received no evidence or affidavits, and had given defendants no opportunity to file an answer. There was no discovery. No one had moved for a summary judgment or judgment on the pleadings. The court simply responded to defendants’ motion to dismiss by rendering judgment for plaintiff.” Gerstein, 494 F.2d at 27 (footnote omitted).
More fundamentally, the reasoning of the Gerstein trial court must be rejected because, in my judgment, it is incorrect. There, the trial court relied upon three district court decisions (namely, R.C.A. Mfg. Co. v. Whiteman, 114 F.2d 86 (2d Cir.1940), Shapiro, Bernstein & Co. v. Miracle Record Co., 91 F.Supp. 473 (N.D.Ill.1950), and Egner v. E.C. Schirmer Music Co., 48 F.Supp. 187 (D.Mass.1942)) to support its conclusion that a sufficiently disseminated performance could result in a general publication. See Gerstein, 344 F.Supp. at 56 n. 76. In each of these cases, the work, which was the subject of a copyright challenge, was of a type that was performed, namely music. To that extent, these cases are similar to Dr. King’s “I Have A Dream” speech. However, none of these cases support the proposition that performance alone; if sufficiently widely disseminated, can constitute a general publication because each of the challenged works had been reduced to tangible copies which had been sold. See Whiteman, 114 F.2d at 88; Miracle Record, 91 F.Supp. at 475; Egner, 48 F.Supp. at 189.
The trial court also relied upon Burke v. NBC, Inc., 598 F.2d 688, 691 (1st Cir.1979), in support of its assertion that publication alone, given sufficient dissemination, *1224 could result in a general publication.[8] See King II, 13 F.Supp.2d at 1352. The trial court appears to have relied upon the language in Burke, which held that “[a] general publication is such dissemination of the work itself among the public as justifies the belief that it has been dedicated to the public and rendered common property.” Burke, 598 F.2d at 691.
Although the reasoning of the trial court may have been justified on the basis of works that are manifested through a physical object, such as books or pieces of art, it is inapplicable to performed works because of the axiom that performance is not a publication, regardless of the size of the audience. This axiom negates any inference that the amount of the dissemination is sufficient to justify a belief that a performed work was dedicated to the public and' thus entered into the public domain inasmuch as an inherent tension exists between the two doctrines. If the size of an audience has no effect on the rule that performance is not a publication, then no degree of dissemination due to performance could result in a dedication to the public. Importantly, the distinction that I seek to draw is consistent with the Ferris holding that performance does not amount to an abandonment of title or to a dedication of the work to the public at large. Ferris, 223 U.S. at 435-36, 32 S.Ct. 263.
The logical result of the rule that performance cannot constitute a publication regardless of audience size is that an affirmative effort to obtain press coverage does not constitute an exception because media coverage does nothing more than increase the size of the audience, which is irrelevant to the issue of publication. Thus, I am of the opinion that the trial court erroneously found that a general publication existed in part because of the widespread dissemination of the speech that had been implemented by the concerted efforts of the March organizers to maximize press coverage. The trial court appears to have found the following factors to be determinative on this issue: (1) “the March organizers were aware of and encouraged the press’ coverage of the March,” (2) “the studied effort by March organizers to secure as wide dissemination of the March’s speeches as possible,” (3) “[dissemination of the speakers’ words to the greatest public audience possible was one goal of the March organizers,” (4) “[t]he press was invited to attend and to film the day’s events,” (5) “[t]he March was broadcast live on multiple television networks and radio stations, and portions, including Dr. King’s speech, were subsequently rebroadcast,” (6) “[a]t no point was the press given express limitations regarding who could film the event or the extent to which their footage could be used,” (7) “there is no indication that any such limitations were made or implied,” and (8) “there is no record of objections by Dr. King or by other March participants or organizers as to the press’ coverage of the event.”[9] King II, 13 F.Supp.2d at 1352. All of these factors, with the exception of the first, were “crucial” to the finding by the trial court that a general publication had occurred. See id. I believe that this reasoning is incorrect as a matter of law. Since the size of the audience before whom a performance occurs is irrelevant, each of these considerations constitute an invalid basis upon which to find a general publication because they amount to nothing more than an effort to assure the dissemination of the performance to the largest audience *1225 possible. Thus, the district court essentially created an exception to the audience-size-is-irrelevant rule based on the public interest in Dr. King’s speech. There is no authority for such an exception. In the fair use decision of Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 555-60, 569, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985), the Supreme Court premised its holding on the principle that the copyright laws protect all authors equally, regardless of the public import of, or interest in, their work. “Congress has not designed, and we see no warrant for judicially imposing, a ‘compulsory license’ permitting unfettered access to the unpublished copyrighted expression of public figures.” Harper & Row, 471 U.S. at 569, 105 S.Ct. 2218.
C.
The trial court also determined that a failure to control copying or reproductions of the speech supported a finding of a general publication. See King II, 13 F.Supp.2d at 1352. This principle appears to originate from American Tobacco Co. v. Werckmeister, 207 U.S. 284, 300, 28 S.Ct. 72, 52 L.Ed. 208 (1907), which stated in dicta that “[w]e do not mean to say that the public exhibition of a painting or statue, where all might see and freely copy it, might not amount to publication within the statute, regardless of the artist’s purpose or notice of reservation of rights which he takes no measure to protect.” In addition, the decision by the trial court evidenced its reliance upon the principle from American Tobacco, 207 U.S. at 299, 28 S.Ct. 72, in which the Supreme Court indicated that the test for a general publication is whether an exhibition of the work to the public evinces a dedication without a reservation of rights rather than merely the right to view and inspect. See King II, 13 F.Supp.2d at 1352.
I believe that the court below erred when it failed to recognize that these maxims have no application in the context of performed works, as made clear by Ferris, which was decided over four years after American Tobacco. In Ferris, the Supreme Court, immediately after enunciating the rule that performance alone cannot constitute publication, quoted favorably from a treatise by Justice Story.
Story states the rule as follows: “So, where a dramatic performance has been allowed by the author to be acted at a theater, no person has a right to pirate such performance, and to publish copies of it surreptitiously; or to act it at another theater without the consent of the author or proprietor; for his permission to act it at a public theater does not amount to an abandonment of his title to it, or to a dedication of it to the public at large.” It has been said that the owner of a play cannot complain if the piece is reproduced from memory. But the distinction is without sound basis and has been repudiated.
Ferris, 223 U.S. at 435-36, 32 S.Ct. 263 (emphasis added and citations omitted). The opportunity to copy or reproduce a performed work, or the fact of performance in and of itself, has no relevance to the issue of whether it has been placed into the public domain because the performance “does not amount to an abandonment of [the author’s] title to it, or to a dedication of it to the public at large.” Id. See also Nutt v. National Inst. Inc. for the Improvement of Memory, 31 F.2d 236, 238 (2d Cir.1929) (“Even where the hearers are allowed to make copies of what was said for their personal use, they cannot later publish for profit that which they had not obtained the right to sell.”). Moreover, given that Dr. King’s speech enjoyed the automatic protection of common law copyright, it is significant that CBS did not point to any authority in which forfeiture was found on the basis of the copying activities or the reproduction of copyrighted work by a third party.
The trial court acknowledged the import of Ferris, but distinguished it in the following manner:
However, the case sub judice [sic] quite a different factual scenario from that confronted in Ferris v. Frohman, in which it was held that the performance of a play did not destroy common law *1226 copyright. A closer situation would be presented if the owner of the common law right to the play in Fromer v. Ferns [sic] had not only allowed the performance of his play but also had invited the press to attend, film, broadcast it live on numerous television and radio stations, and replay parts on news programs, and then the owner had sought and selectively asserted statutory copyright protection. The court does not believe that such inconsistent actions, as occurred in the captioned case, can be seen as anything other than a general publication extinguishing common law copyright protection.
King II, 13 F.Supp.2d at 1351. In support of this reasoning, the trial court opined that “[t]he concept that dissemination by performance could reach such heights as to be a publication is not a new one,” relying upon Gerstein. King II, 13 F.Supp.2d at 1351. However, as indicated above, Gerstein does not validly support that proposition.[10]
The trial court also cited Letter Edged in Black Press, Inc. v. Public Bldg. Comm’n of Chicago, 320 F.Supp. 1303 (N.D.Ill.1970), where a general publication of a sculpture had been found to exist based upon the lack of restriction on the copying and successful efforts to' court press coverage, with no restrictions on press reproductions. See King II, 13 F.Supp.2d at 1354. However, I believe that Letter Edged in Black Press is not applicable to this controversy for several reasons.
First, that court had placed importance on the supplying of uncopyrighted tangible copies, in the form of photographs of the work, which were made available upon request. See Letter Edged in Black Press, 320 F.Supp. at 1311. By contrast, no similar situation is presented in the decision below because the trial court expressly disavowed any reliance on the only two tangible copies in evidence. See King II, 13 F.Supp.2d at 1353 n. 5.
Second, and more fundamentally, Letter Edged in Black Press is distinguishable, in that the copyrightable work at issue was physical and thus the application of the American Tobacco principles was justified. In contrast, the situation presented here involves a copyrightable work that is manifested by performance. The American Tobacco principles of unfettered copying and reproduction, or an exhibition which demonstrates a dedication without reservation of rights, are inapposite to performed works in the absence of an authorized distribution of tangible copies. Otherwise, it would be very difficult, if even possible, to explain the results in Silverman v. CBS, Inc., 632 F.Supp. 1344, 1347, 1350 (S.D.N.Y.1986), aff'd in part, vacated in part on other grounds by 870 F.2d 40 (2d Cir.1989)[11] and CBS, Inc. v. Documentaries Unlimited, Inc., 42 Misc.2d 723, 248 N.Y.S.2d 809, 811 (Sup.Ct.1964),[12] where Appellee was held by the trial court to have a valid copyright over radio broadcasts whose performances were ostensibly disseminated to thousands, or perhaps even millions, of people.
D.
For the reasons that have been explained above, I would hold that no publication, general or limited, occurred because Dr. King’s delivery of his “I Have A Dream” speech was a mere performance of that work, and performance simply cannot constitute a publication regardless of (1) the size of the audience involved, or (2) efforts to obtain widespread contemporary *1227 news coverage under circumstances that may have allowed the copying of the work.[13] It is my belief that this analysis (1) differs significantly from one which is premised on a limited publication theory, and (2) also avoids the legal fiction of declaring that Dr. King’s “I Have A Dream” speech, as a limited publication, was communicated to a select group for a narrow purpose, a holding that has been generally criticized by commentators.[14]

. These issues include whether (1) a general publication occurred as a result of the distribution of tangible copies of the speech prior to Dr. King's copyright registration, (2) the fair use doctrine protects CBS, (3) CBS enjoys a First Amendment privilege against liability, and (4) CBS had an implied license to use its footage of the speech.

. Section 9 was renumbered to § 10 by the 1947 amendments.

. If this condition was satisfied, § 12 of the 1909 Act, which later became § 13 by virtue of an amendment, allowed for the copyright to be registered by having two complete copies "promptly deposited” with the Copyright Office.

. At least one court appears to have construed this phrase to refer to unpublished works. See Hirshon, 243 F.2d at 644.

. That section was codified at 17 U.S.C. § 12 after the 1947 amendments.

. Dr. King made revisions to his "I Have A Dream” speech as late as 4:00 a.m. on the day of the March. See King v. Mister Maestro, Inc., 224 F.Supp. 101, 103 (S.D.N.Y.1963).

. Presumably, the tangible copies would have to be substantially or essentially identical to the performed work.

. The trial court also cited Silverman v. CBS, Inc., 632 F.Supp. 1344, 1353 (S.D.N.Y.1986), aff'd in part, vacated in part on other grounds by 870 F.2d 40 (2d Cir.1989). However, the cited portion of the opinion does not support this proposition.

. Among these listed factors that were included by the trial court is the following statement: "Dr. King provided the press with an advance text of his speech to enable them to film and broadcast the events more easily.” King II, 13 F.Supp.2d at 1352. However, the trial court later indicated that it did not rely upon the partial advance press draft to reach its conclusion. See id. at 1353 n. 5.

. See supra Part (B).

. The court determined that CBS had a copyright over radio broadcasts of "The Amos n’ Andy Show" from 1928 to 1948 because the " rendering of the performance before the microphone cannot be held to be an abandonment of ownership to it by the proprietor or a dedication of it to the public at large,' " quoting Uproar Co. v. NBC, 8 F.Supp. 358, 362 (D.Mass.1934), modified 81 F.2d 373 (1st Cir.1936).

.The court determined that CBS had a copyright over a radio broadcaster's news announcement concerning President Kennedy’s assassination.

. For the same reasons as Chief Judge Anderson specifies in footnote four to his opinion, I also emphasize that this result has been reached without any reliance on the partial advance press draft or the SCLC newsletter.

. See, e.g., Nimmer on Copyright § 4.13 [A] n.ll; Marshall A Leafier, Understanding Copyright Law § 4.5[C] at 112-13 (2d ed.1995); 1 William F. Patry, Copyright Law and Practice at 418 n.80 (1994); E. Fulton Brylawski, Publication: Its Role in Copyright Matters, Both Past and Present, 31 J. Copyright Soc. U.S.A. 507, 522 (1984).