ESTATE OF MARTIN LUTHER KING, JR., INC., Plaintiff-Appellant,

v.

CBS, INC., Defendant-Appellee.

No. 98-9079.

United States Court of Appeals,

Eleventh Circuit.

Nov. 5, 1999.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:96-cv-3052-WCO), William C. O'Kelley, Judge.

Before ANDERSON, Chief Judge, RONEY, Senior Circuit Judge, and COOK[*], Senior District Judge.

ANDERSON, Chief Judge:

The Estate of Martin Luther King, Jr., Inc. brought this copyright infringement action against CBS, Inc. after CBS produced a video documentary that used, without authorization, portions of civil rights leader Dr. Martin Luther King's famous "I Have a Dream" speech at the March on Washington on August 28, 1963. The district court granted summary judgment to CBS on the ground that Dr. King had engaged in a general publication of the speech, placing it into the public domain. *Estate of Martin Luther King, Jr., Inc. v. CBS, Inc.,* 13 F.Supp.2d 1347 (N.D.Ga.1998). We now reverse.[**]

## I. FACTS

The facts underlying this case form part of our national heritage and are well-known to many Americans. On the afternoon of August 28, 1963, the Southern Christian Leadership Conference ("SCLC") held the March on Washington ("March") to promote the growing civil rights movement. The events of the day were seen and heard by some 200,000 people gathered at the March, and were broadcast live via radio

---

[*]Honorable Julian Abele Cook, Jr., Senior U.S. District Judge for the Eastern District of Michigan, sitting by designation.

[**]Chief Judge Anderson and Judge Cook comprise the majority holding that there has been no publication of the speech that destroyed Dr. King's common law copyright protection. Chief Judge Anderson's reasoning is set out in this opinion; Judge Cook's related but somewhat different reasoning is set out in his separate opinion.

and television to a nationwide audience of millions of viewers. The highlight of the March was a rousing speech that Dr. Martin Luther King, Jr., the SCLC's founder and president, gave in front of the Lincoln Memorial ("Speech"). The Speech contained the famous utterance, "I have a dream ...," which became symbolic of the civil rights movement. The SCLC had sought out wide press coverage of the March and the Speech, and these efforts were successful; the Speech was reported in daily newspapers across the country, was broadcast live on radio and television, and was extensively covered on television and radio subsequent to the live broadcast.

On September 30, 1963, approximately one month after the delivery of the Speech, Dr. King took steps to secure federal copyright protection for the Speech under the Copyright Act of 1909, and a certificate of registration of his claim to copyright was issued by the Copyright Office on October 2, 1963. Almost immediately thereafter, Dr. King filed suit in the Southern District of New York to enjoin the unauthorized sale of recordings of the Speech and won a preliminary injunction on December 13, 1963. *King v. Mister Maestro, Inc.,* 224 F.Supp. 101 (S.D.N.Y.1963).

For the next twenty years, Dr. King and the Estate enjoyed copyright protection in the Speech and licensed it for a variety of uses, and renewed the copyright when necessary. In 1994, CBS entered into a contract with the Arts & Entertainment Network to produce a historical documentary series entitled "The 20th Century with Mike Wallace." One segment was devoted to "Martin Luther King, Jr. and The March on Washington." That episode contained material filmed by CBS during the March and extensive footage of the Speech (amounting to about 60% of its total content). CBS, however, did not seek the Estate's permission to use the Speech in this manner and refused to pay royalties to the Estate. The instant litigation ensued.

On summary judgment, the district court framed the issue as "whether the public delivery of Dr. King's speech ... constituted a general publication of the speech so as to place it in the public domain." 13 F.Supp.2d at 1351. After discussing the relevant case law, the district court held that Dr. King's "performance coupled with such wide and unlimited reproduction and dissemination as occurred concomitant to Dr. King's

2

speech during the March on Washington can be seen only as a general publication which thrust the speech into the public domain." *Id.* at 1354.[1] Thus, the district court granted CBS's motion for summary judgment. The Estate now appeals to this Court.

## II. DISCUSSION

We review the district court's grant of summary judgment *de novo,* with all facts and reasonable inferences therefrom reviewed in the light most favorable to the nonmoving party. *Hale v. Tallapoosa County,* 50 F.3d 1579, 1581 (11th Cir.1995). Summary judgment was due to be granted only if the forecast of evidence before the district court showed that there was no genuine issue as to any material fact and that the moving party, i.e., CBS, was entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

Because of the dates of the critical events, the determinative issues in this case are properly analyzed under the Copyright Act of 1909 ("1909 Act"), rather than the Copyright Act of 1976 ("1976 Act") that is currently in effect. *See Brown v. Tabb,* 714 F.2d 1088, 1091 (11th Cir.1983) ("[T]he determination whether a work entered the public domain prior to the effective date of the 1976 Act must be made according the copyright law as it existed before that date."). The question is whether Dr. King's attempt to obtain statutory copyright protection on September 30, 1963 was effective, or whether it was a nullity because the Speech had already been forfeited to the public domain via a general publication.[2]

Under the regime created by the 1909 Act, an author received state common law protection automatically at the time of creation of a work. 1 Melville B. Nimmer & David Nimmer, *Nimmer on*

---

[1] The district court noted that there potentially was some additional evidence of general publication. First, the SCLC published a newsletter of wide circulation containing the full text of the Speech. Second, an advance text of the Speech may have been freely available to the public in a press tent at the March. However, the district court disregarded both of these items of evidence because the procedural posture of the case was one of summary judgment, and "material facts [were] in dispute as to whether the use of Dr. King's speech in the newsletter was authorized and also as to the actual availability of the advance text." 13 F.Supp.2d at 1353 n. 5.

[2] If Dr. King and the Estate had a valid copyright in the Speech under the 1909 Act, that copyright was carried forward under the 1976 Act pursuant to the provisions of 17 U.S.C. § 304. In 1991, the copyright in the Speech was duly renewed.

3

*Copyright* § 4.01[B] (1998) [hereinafter *Nimmer* ].  This state common law protection persisted until the moment of a general publication.[3]  *Silverman v. CBS Inc.,* 632 F.Supp. 1344, 1353 (S.D.N.Y.1986).  When a general publication occurred, the author either forfeited his work to the public domain, *see, e.g., White v. Kimmell,* 193 F.2d 744 (9th Cir.), *cert. denied,* 343 U.S. 957, 72 S.Ct. 1052, 96 L.Ed. 1357 (1952), or, if he had therebefore complied with federal statutory requirements, converted his common law copyright into a federal statutory copyright.  *See Mister Maestro,* 224 F.Supp. at 105 ("The [statutory] copyright may be obtained before publication of such works but as soon as publication occurs there must be compliance with the requirements as to published works.");  *see generally* 1 *Nimmer* § 4.01[B].

In order to soften the hardship of the rule that publication destroys common law rights, courts developed a distinction between a "general publication" and a "limited publication." *Brown,* 714 F.2d at 1091 (citing *American Vitagraph, Inc. v. Levy,* 659 F.2d 1023, 1026-27 (9th Cir.1981)).  Only a general publication divested a common law copyright.  *Id.*  A general publication occurred "when a work was made available to members of the public at large without regard to their identity or what they intended to do with the work." *Id.* (citing *Burke v. National Broadcasting Co.,* 598 F.2d 688, 691 (1st Cir.), *cert. denied,* 444 U.S. 869, 100 S.Ct. 144, 62 L.Ed.2d 93 (1979)).  Conversely, a non-divesting limited publication was one that communicated the contents of a work to a select group and for a limited purpose, and without the right of diffusion, reproduction, distribution or sale.  *Id.* (citing *White,* 193 F.2d at 746-47).  The issue before us is whether Dr. King's delivery of the Speech was a general publication.

Numerous cases stand for the proposition that the performance of a work is not a general publication.  *See, e.g., Ferris v. Frohman,* 223 U.S. 424, 433, 32 S.Ct. 263, 265, 56 L.Ed. 492 (1912) ("The public representation of a dramatic composition, not printed and published, does not deprive the owner of his common-law right....  [T]he public performance of the play is not an abandonment of it to the public use.");

---

[3]We stress that in this area of the law the word "publication" is "a legal word of art, denoting a process much more esoteric than is suggested by the lay definition of the term."  Melville B. Nimmer, *Copyright Publication,* 56 Colum. L.Rev. 185, 185 (1956).

4

*Nutt v. National Inst. Incorporated for the Improvement of Memory,* 31 F.2d 236, 238 (2d Cir.1929) ("The author of a literary composition, as a lecture, may profit from public delivery, but that does not constitute the kind of publication which deprives him of the protection of the copyright statute...."); *Mister Maestro,* 224 F.Supp. at 106 ( "The copyright statute itself plainly shows that 'oral delivery' of an address is not a dedication to the public."); *McCarthy & Fischer v. White,* 259 F. 364, 364 (S.D.N.Y.1919) (rejecting infringer's argument that "the presentation of the song ... in vaudeville prior to the date of copyright was a complete dedication to the public," because "[i]t is ... well settled that the public performance of a dramatic or musical composition is not an abandonment of the composition to the public"); *Columbia Broad. Sys., Inc. v. Documentaries Unlimited, Inc.,* 42 Misc.2d 723, 248 N.Y.S.2d 809, 811 (1964) (holding with respect to news anchor's famous announcement of the death of President Kennedy that "[t]he rendering of a performance before the microphone does not constitute an abandonment of ownership or a dedication of it to the public at large"); *cf. American Tobacco Co. v. Werckmeister,* 207 U.S. 284, 299, 28 S.Ct. 72, 77, 52 L.Ed. 208 (1907) (no general publication where there is merely "the exhibition of a work of art at a public exhibition"); *Burke,* 598 F.2d at 693 ("Publication did not occur merely because the film was shown to the general public."); *Patterson v. Century Prods., Inc.,* 93 F.2d 489, 492-93 (2d Cir.1937) (no divestive general publication of motion picture occurred where "the distribution was limited to exhibitions of the picture without charge, no one was given the right to use the copies sent out for any purpose whatsoever," and "[t]he positive films were merely loaned for that purpose which did not permit copying"), *cert. denied,* 303 U.S. 655, 58 S.Ct. 759, 82 L.Ed. 1114 (1938); *see generally Nimmer* § 4.08, at 4-43 ("[T]he oral dissemination or performance of a literary, dramatic, or musical work does not constitute a publication of that work.").

It appears from the case law that a general publication occurs only in two situations. First, a general publication occurs if tangible copies of the work are distributed to the general public in such a manner as allows the public to exercise dominion and control over the work. *See Burke,* 598 F.2d at 693 ("The decisive issue was whether [the author's] release of the film itself to [a third party] was, under the circumstances, a

general publication."); *Mister Maestro,* 224 F.Supp. at 107 (" 'A *sine qua non* of publication should be the acquisition by members of the public of a possessory interest in *tangible* copies of the work in question.' ") (quoting Nimmer, *supra,* 56 Colum. L.Rev. at 197); Nimmer, *supra,* 56 Colum. L.Rev. at 196 ("[E]ven if a performance were regarded as a copy of the work being performed, the act of publication would not occur merely by virtue of viewing the performance since an audience does not thereby gain such dominion over the copy as to warrant the conclusion that the work has been surrendered to the public."). Second, a general publication may occur if the work is exhibited or displayed in such a manner as to permit unrestricted copying by the general public. *See American Tobacco,* 207 U.S. at 300, 28 S.Ct. at 77 ("We do not mean to say that the public exhibition of a painting or statue, where all might see and freely copy it, might not amount to [divestive] publication...."); *Patterson,* 93 F.2d at 492 ("The test of general publication is whether the exhibition of the work to the public is under such conditions as to show dedication without reservation of rights or only the right to view and inspect it without more."); *Letter Edged in Black Press, Inc. v. Public Bldg. Comm'n of Chicago,* 320 F.Supp. 1303, 1311 (N.D.Ill.1970) (invoking this exception where "there were no restrictions on copying [of a publicly displayed sculpture] and no guards preventing copying" and "every citizen was free to copy the maquette for his own pleasure and camera permits were available to members of the public"). However, the case law indicates that restrictions on copying may be implied, and that express limitations in that regard are deemed unnecessary. *See American Tobacco,* 207 U.S. at 300, 28 S.Ct. at 77 (holding that there is no general publication where artwork is exhibited and "there are bylaws against copies, or where it is *tacitly* understood that no copying shall take place, and the public are admitted ... on the *implied understanding* that no improper advantage will be taken of the privilege" (emphasis added)); *Burke,* 598 F.2d at 693 (holding that releasing a film to a professor and host of an educational television program, and authorizing him to copy and broadcast same on public television was a limited publication because the grant of permission to use the film contained an *implied* condition against distributing copies of the film to others or using it for other purposes); *Nutt,* 31 F.2d at 238 (lectures were not generally published when delivered

6

because oral delivery is not publication, and "[e]ven where the hearers are allowed to make copies of what was said for their personal use, they cannot later publish for profit that which they had not retained the right to sell").

The case law indicates that distribution to the news media, as opposed to the general public, for the purpose of enabling the reporting of a contemporary newsworthy event, is only a limited publication. For example, in *Public Affairs Assoc., Inc. v. Rickover,* 284 F.2d 262 (D.C.Cir.1960), *vacated on other grounds,* 369 U.S. 111, 82 S.Ct. 580, 7 L.Ed.2d 604 (1962), the court said that general publication occurs only when there is "a studied effort not only to secure publicity for the contents of the addresses through the channels of information, but to *go beyond customary sources of press or broadcasting* in distributing the addresses to any interested individual." *Id.* at 270 (emphasis added). Although the *Rickover* court ultimately held that a general publication had occurred, it contrasted the "limited use of the addresses by the press for fair comment," i.e., limited publication, with "the unlimited distribution to anyone who was interested," i.e., general publication. *Id.* at 271. *See also Mister Maestro,* 224 F.Supp. at 107 (taking the position that solicitation of news coverage and distribution to the media amounts to only a limited publication); *cf. Documentaries Unlimited, Inc.,* 248 N.Y.S.2d at 810-11 (news anchor's announcement concerning the assassination of President Kennedy was not generally published by virtue of the broadcast over the radio as newsworthy material). This rule comports with common sense; it does not force an author whose message happens to be newsworthy to choose between obtaining news coverage for his work and preserving his common-law copyright. As the dissenting judge in the *Rickover* case remarked (which remark was entirely consistent with the majority opinion in the case), "[t]here is nothing in the law which would compel this court to deprive the creator of the right to reap financial benefits from these efforts because, at the time of their creation, they had the added virtue of being newsworthy events of immediate public concern." *Rickover,* 284 F.2d at 273 (Washington, J., dissenting).

7

With the above principles in mind, in the summary judgment posture of this case and on the current state of this record, we are unable to conclude that CBS has demonstrated beyond any genuine issue of material fact that Dr. King, simply through his oral delivery of the Speech, engaged in a general publication making the Speech "available to members of the public at large without regard to their identity or what they intended to do with the work." *Brown,* 714 F.2d at 1091. A performance, no matter how broad the audience, is not a publication; to hold otherwise would be to upset a long line of precedent. This conclusion is not altered by the fact that the Speech was broadcast live to a broad radio and television audience and was the subject of extensive contemporaneous news coverage. We follow the above cited case law indicating that release to the news media for contemporary coverage of a newsworthy event is only a limited publication.[4]

---

[4]We emphasize the summary judgment posture of this case, which necessitates that we disregard evidence that may be important or even dispositive at trial. In other words, in this summary judgment posture, we consider only the evidence with respect to which there is no genuine issue of material fact. This evidence includes only the fact of the oral delivery of the Speech to a large audience and the fact that the sponsors of the event including Dr. King sought and successfully obtained live broadcasts on radio and television and extensive contemporary coverage in the news media. In this regard, we do not consider at this stage of the litigation two potentially important pieces of evidence brought to our attention by CBS. First, an advance text of the Speech was apparently available in a press tent on the day of the speech. According to an eyewitness affidavit submitted by CBS, members of the public at large—not merely the press—were permitted access to the press tent and were given copies of the advance text. However, the Estate has proffered affidavits which contradict the statements of the CBS witness, and suggest that access was controlled by the SCLC within reasonable means. Moreover, the Estate argues that much of the content of the Speech was generated extemporaneously by Dr. King and was not contained in this advance text—an argument that we do not consider but that can be explored by the district court. Finding genuine issues of material fact with respect to the availability of the advance text to the general public, the district court disregarded CBS's allegations in this regard. 13 F.Supp.2d at 1353 n. 5. We agree, and do likewise.

Second, CBS has produced a September 1963 issue of the SCLC's newsletter in which the text of the Speech was reprinted in its entirety, with no copyright notice. The newsletter was widely circulated to the general public. Indeed, at oral argument, the Estate conceded that this reprinting of the Speech and wide distribution of the newsletter would constitute a general publication, if it were authorized by Dr. King. However, the Estate has raised the issue that Dr. King did not authorize this reprinting and distribution of the Speech. Finding genuine issues of fact in this regard, the district court disregarded this evidence. We agree, and do likewise.

Finally, we note that the opinion in *Mister Maestro,* 224 F.Supp. at 104, suggests that there may have been evidence of subsequent rebroadcasts of the Speech in movie houses and sales of phonograph records. We do not consider any such evidence because CBS has not argued in this appeal that such evidence is relevant at this stage. Moreover, the opinion in *Mister Maestro* suggests that there may be genuine issues of material fact (e.g., authorization) with respect to such evidence.

Our conclusion finds significant support from *Burke v. National Broadcasting Co., Inc.,* 598 F.2d 688 (1st Cir.), *cert. denied,* 444 U.S. 869, 100 S.Ct. 144, 62 L.Ed.2d 93 (1979). Burke captured on film a highly unusual and dramatic encounter in which a zebra attacked a lioness who had killed the zebra's foal. *Id.* at 689. Grzimek, a professor and a host of an educational television program, wrote Burke requesting permission to use the film in his lectures and in the educational television program. *Id.* at 690. Burke responded affirmatively, sending Grzimek the film accompanied by a short reply that contained neither express authorization nor express restriction with respect to other possible uses of the film. *Id.* at 690, 693. Grzimek initially used the film only for the stated purposes, but later transmitted a copy of the film to a commercial company specializing in nature films, which in turn sold a production that included the film to NBC. The issue was whether Burke's common law copyright was forfeited to the public domain by virtue of the circumstances surrounding his seemingly unconditioned release of the film to Grzimek. In other words, the issue was whether there had been a general publication. The First Circuit held that only a limited publication had occurred, and that Burke's common law copyright had not been lost. *Id.* at 694. The court defined a general publication as occurring when a work is made available to the public at large without regard to who they are or what they propose to do with it, *id.* at 691; noted that courts have hesitated to find a general publication which divests a common law copyright, *id.;* and noted the settled law that a mere performance or exhibition of a work is not a general publication. *Id.* Recognizing that a general publication can be found if the public were free to copy the work on exhibit, the First Circuit held that a prohibition on copying can be tacitly understood. *Id.* (citing *American Tobacco,* 207 U.S. at 300, 28 S.Ct. 72). Applying the foregoing principles, the court sustained Burke's common law copyright as against NBC. *Id.* at 690, 694. The *Burke* court held that Burke's authorization of Grzimek's broadcast of the film on noncommercial television did not result in a general publication. *Id.* at 693 ("Allowing the film to be used for the purposes requested was not a blanket authorization to use it for any purpose, much less to release it to a commercial

9

producer."). The court recognized that Burke did not explicitly state that Grzimek could not distribute copies of the film to others, or use it for other purposes, but the court said "such limitations are reasonably to be implied." *Id.*

We believe that the authority granted to the press in the instant case—extensive news coverage including live broadcasts—is analogous to the authority granted in *Burke.* In *Burke,* authority was granted to the host of an educational television program to broadcast on television; in the instant case, authority was granted to the press for extensive news coverage, also including broadcasts on television. In both cases, the authority was granted to a limited group for a limited purpose. In both cases, the restrictions on copying and reproducing were implied. The soundness of our analogy to *Burke* is also supported by the foregoing case law indicating generally that distribution to the news media for the purpose of news coverage is only a limited publication.

The district court held that "the circumstances in this case take the work in question outside the parameters of the 'performance is not a publication' doctrine." 13 F.Supp.2d at 1351. These circumstances included "the overwhelmingly public nature of the speech and the fervent intentions of the March organizers to draw press attention." *Id.* Certainly, the Speech was one of a kind—a unique event in history.[5] However, the features that make the Speech unique—e.g., the huge audience and the Speech's significance in terms of newsworthiness and history—are features that, according to the case law, are not significant in the general versus limited publication analysis. With respect to the huge audience, the case law indicates that the general publication issue depends, not on the number of people involved, but rather on the fact that the work is made available to the public without regard to who they are or what they propose to do with it. *See Brown v. Tabb,* 714 F.2d 1088, 1091-92 (11th Cir.1983). For this proposition, *Brown* cited *Burke,* 598 F.2d at 691 ("[G]eneral publication depends on the author making the work available to those interested, and not on the number of people who actually express an interest."). To the same effect, *see Mister Maestro,* 224 F.Supp.

---

[5]The district court stated that "as one of the most public and most widely disseminated speeches in history, [the Speech] could be the poster child for general publications." 13 F.Supp.2d at 1353.

at 106-07 (relying upon the "one or many persons" language in *American Tobacco,* 207 U.S. at 299, 28 S.Ct. 72, and on *Rickover* ). In the instant case, the district court acknowledged that "[t]he size of the audience before which a work is performed cannot be the basis for a court's finding that a general publication has occurred." 13 F.Supp.2d at 1352.

With respect to the significance of the Speech in terms of newsworthiness and history, the case law again suggests that this feature should not play a substantial role in the analysis. As noted above, the D.C. Circuit in *Rickover* indicated that the wide press distribution of the speeches at issue there would not alone have constituted a general publication. Indeed, *Mister Maestro* so held with respect to the very Speech at issue before us. Also supporting this proposition is the case law above cited to the effect that size of the audience is not significant.

The district court cited *Letter Edged in Black Press, Inc. v. Public Building Commission of Chicago,* 320 F.Supp. 1303 (N.D.Ill.1970), CBS's best case, in support of its reasoning, *see* 13 F.Supp.2d at 1353-54, and that case warrants some exploration. In *Letter Edged in Black,* the question was whether the city had dedicated a Picasso sculpture (located in front of the Chicago Civic Center) to the public domain by general publication. The city had done the following: it carried out a massive campaign to publicize the monumental sculpture; it placed a maquette (portable model of the sculpture) on exhibition at a local museum; it gave photographs to the public upon request; it arranged for pictures of the sculpture to appear in several magazines of large national circulation; it sold a postcard featuring the sculpture; and it distributed numerous publications and reports containing photographs of the sculpture. *Letter Edged in Black,* 320 F.Supp. at 1306-07. After stating the controlling legal principles with regard to general and limited publication, the *Letter Edged in Black* court stated its view that the cumulation of these various acts by the city equated to general publication. *Id.* at 1309. The court then distinguished *American Tobacco,* 207 U.S. 284, 28 S.Ct. 72, 52 L.Ed. 208, the primary authority that the city cited to support its theory of mere limited publication. In *American Tobacco,* the Supreme Court held that the display of a painting in a gallery did not constitute

11

general publication putting the painting into the public domain. According to the *Letter Edged in Black* court, a cornerstone of *American Tobacco* was the fact that copying of the painting was strictly forbidden and the gallery strictly enforced the anti-copying rules. *Letter Edged in Black,* 320 F.Supp. at 1310. The court held that the facts in *Letter Edged in Black* were distinguishable:

> In the case at bar there were no restrictions on copying and no guards preventing copying. Rather every citizen was free to copy the maquette for his own pleasure and camera permits were available to members of the public. At its first public display the press was freely allowed to photograph the maquette and publish these photographs in major newspapers and magazines. Further, officials at this first public showing of the maquette made uncopyrighted pictures of the maquette available on request. Were this activity strictly classified as limited publication, there would no longer be any meaningful distinction between limited and general publication.

*Id.* at 1311 (footnotes omitted).

The district court likened the instant case to *Letter Edged in Black* on the ground that there was a lack of restriction on copying and free allowance of reproduction by the press. However, we do not believe the analogy fits—at least not at this summary judgment stage. Significantly, in *Letter Edged in Black* there were manifestations of the city's intent to distribute generally among the public at large that have no parallels in the evidence we can consider in the instant summary judgment posture. The city gave photographs of the sculpture to the public, not merely the press, upon request. The city commercially sold a postcard featuring the sculpture. Copying was apparently widespread at an exhibit of the sculpture, and the city took no action to curtail copying and photographing by the public. *Letter Edged in Black,* 320 F.Supp. at 1306-07, 1311. At trial, CBS may well produce evidence that brings the instant case on all fours with *Letter Edged in Black,*[6]

---

[6]For example, if the SCLC's reprinting of the text of the Speech in the September 1963 newsletter was authorized, *see supra* note 4, that reprinting might be analogous to the public distribution of photographs in *Letter Edged in Black.* Similarly, if CBS were to adduce evidence that Dr. King or his agents offered copies of the Speech indiscriminately to any member of the public who requested them, e.g., through the availability of the advance text in the press tent, that would make the facts of the instant case closer to those of *Letter Edged in Black.*

but the present state of the record does not support the analogy;  to the contrary, the performance of the Speech in the instant case is more like the exhibition of the painting in the gallery in *American Tobacco*.[7]

Because there exist genuine issues of material fact as to whether a general publication occurred, we must reverse the district court's grant of summary judgment for CBS. It would be inappropriate for us to address CBS's other arguments, e.g., fair use and the First Amendment, because the district court did not address them, and because the relevant facts may not yet be fully developed.  Of course, we express no opinion on the eventual merits of this litigation.  The judgment of the district court is reversed and remanded for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.[8]

COOK, Senior District Judge, concurring in part and dissenting in part:

I concur in the result that was reached by my distinguished colleague, Chief Judge Anderson. Nevertheless, I write separately to express my own thoughts about this very complicated area of the law.  To summarize, I agree with the proposition that this case is controlled by the 1909 Copyright Act, under which Dr. King did not lose copyright protection over his "I Have A Dream Speech" by placing it into the public domain based on the factors considered below.  However, my reading of the law leads me to believe that a

---

[7]*Public Affairs Associates, Inc. v. Rickover,* where the D.C. Circuit found a general publication by virtue of Admiral Rickover's distribution to the public of copies of his speeches, is also factually distinguishable. " 'In distributing the speeches, Admiral Rickover mailed some [copies] to individuals who had requested copies or who[m] Admiral Rickover believed would be interested in the subject.  Some were sent by Admiral Rickover, approximately 50 in each case, to the sponsor of the speech to be made available to the press *and others* at the place where the speech was to be delivered.' " *Rickover,* 284 F.2d at 266 (emphasis added) (quoting the parties' agreed statement of facts).  In short, as the court observed, "[a]nyone was welcome to a copy." *Id.* at 271.  The present state of the record in the instant case does not allow us to draw similar conclusions with respect to Dr. King's Speech.

[8]The Estate also argued that the Newsletter should be excluded because CBS erroneously invoked the attorney work product doctrine to excuse its late disclosure of the Newsletter, and because such a violation of CBS's discovery obligations warrants suppression of the evidence.  We decline to address the work product issue because our opinion on appeal expressly does not rely upon the Newsletter, *see supra* note 4, and because it is not at all clear that the district court would have suppressed the evidence even if there had been a discovery violation.  I am authorized to say that Judge Roney joins in this regard.

distinction between works that are performed and those that are not is crucial to a proper resolution of this dispute. I will attempt to explain my rationale, as well as the ramifications that flow from it.

Additionally, I agree with Chief Judge Anderson that the remaining issues that have been raised by the parties but not ruled upon by this Court in this appeal are not appropriate for an appellate ruling.[1]

The district court held that a general publication had occurred on the basis of the combined presence of three factors; namely, (1) the performance of the speech by Dr. King during the March on Washington, (2) its contemporaneous wide dissemination by the press, through the broadcasting and print media, which resulted from the concerted efforts of the March organizers to gain media attention, and (3) the lack of restrictions, explicit, implicit, or in practice, on the copying or reproduction of the speech by the press or public. *See Estate of Martin Luther King, Jr., Inc. v. CBS, Inc.,* 13 F.Supp.2d 1347, 1353 (N.D.Ga.1998) [hereinafter *King II* ]. While agreeing with Chief Judge Anderson that the speech was not placed into the public domain on the basis of these factors, I do not reach this conclusion because of the limited publication rule. Rather, I rely upon the more fundamental principle that, in the context of performed works, none of these factors may be properly considered as having contributed to a general or limited publication in the absence of an authorized dissemination of a tangible copy of the work without copyright notice.

A.

In my opinion, the trial court erred by holding that Dr. King's performance of the speech was a factor which contributed to a general publication. The long-standing, well-understood, and accepted rule in copyright law is that performance does not constitute publication. *See Ferris v. Frohman,* 223 U.S. 424, 434-36, 32 S.Ct. 263, 56 L.Ed. 492 (1912); *see also* 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 4.08[A] (1998); 1 William F. Patry, *Copyright Law and Practice* at 417-18 (1994); 18 Am.Jur.2d *Copyright and Literary Property* § 13 (1985). This was the rule under state common law.

---

[1]These issues include whether (1) a general publication occurred as a result of the distribution of tangible copies of the speech prior to Dr. King's copyright registration, (2) the fair use doctrine protects CBS, (3) CBS enjoys a First Amendment privilege against liability, and (4) CBS had an implied license to use its footage of the speech.

> The public representation of a dramatic composition, not printed and published, does not deprive the owner of his common-law right, save by operation of statute. *At common law, the public performance of the play is not an abandonment of it to the public use.*

*Ferris,* 223 U.S. at 435, 32 S.Ct. 263. This principle was also applied to the 1909 Act by the courts, and was eventually codified in the 1976 Act. *Nimmer on Copyright* § 4.08[A] & n.1; 17 U.S.C. § 101; *see American Vitagraph, Inc. v. Levy,* 659 F.2d 1023, 1028 (9th Cir.1981).

Inasmuch as the 1976 Act simply adopts the performance rule that existed under state common law and the 1909 Act, any reference to its provisions conclusively establishes that Dr. King's oration of his "I Have A Dream" speech should not be construed as contributing to a divestive publication.

> "Publication" is the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication. *A public performance ... of a work does not of itself constitute publication.*

17 U.S.C. § 101 (emphasis added). Further,

> [t]o perform ... a work "publicly" means-
>
> (1)     to perform ... it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or
>
> (2)     to transmit or otherwise communicate a performance ... of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

*Id.* Dr. King's performance of the speech in the presence of over 200,000 individuals who had assembled for a demonstration at the Lincoln Memorial falls squarely within subclause (1) above, while the transmission of his speech by radio and television meets the criteria in subclause (2).

Moreover, consistent with the rationale behind the rule that performance is not a publication, I would hold that, for those controversies that are governed by the 1909 Act, neither a general nor a limited publication can ever occur merely from performance in the absence of an authorized distribution of a tangible copy of the work without a copyright notice or reservation of rights. Under the 1909 Act, a statutory

15

copyright over a performed work could be obtained by two methods, each of which required the existence of a tangible copy. *See Hirshon v. United Artists Corp.,* 243 F.2d 640, 644 (D.C.Cir.1957). Section 9 of the 1909 Act[2] provided that a copyright claim could be secured by affixing a notice to the tangible copies that were published or offered for sale.[3] On the other hand, if a performed work, such as a speech or musical or dramatic composition, had not been "reproduced in copies for sale,"[4] § 11 of the 1909 Act permitted an author to gain statutory copyright protection only by depositing a tangible copy with the Copyright Office.[5] Due to their peculiar nature, there were too many cases in which the requirement under the 1909 Act (to wit, that a tangible copy must exist before statutory copyright protection could be obtained) was unrealistically onerous for performed works because of the common necessity to make last minute revisions to plays, or, as this case exemplifies, speeches.[6] *See* 1 *Nimmer on Copyright* § 4.08[B]. The 1909 Act appears to have recognized this problem, as § 2 (emphasis added) specified that "[n]othing in this title shall be construed to annul or limit the right of the author or proprietor of an *unpublished* work, at common law or equity, to prevent the copying, publication, or use of such unpublished work without his consent, and to obtain damages therefor." Thus, § 2 recognized an absolute need for the strict adherence to a rule that, in the absence of a published tangible copy, a performance alone would never constitute a publication. Otherwise, an author could lose all copyright protection because of his inability to comply with the tangible copy requirement prior

---

[2]Section 9 was renumbered to § 10 by the 1947 amendments.

[3]If this condition was satisfied, § 12 of the 1909 Act, which later became § 13 by virtue of an amendment, allowed for the copyright to be registered by having two complete copies "promptly deposited" with the Copyright Office.

[4]At least one court appears to have construed this phrase to refer to unpublished works. *Hirshon,* 243 F.2d at 644.

[5]That section was codified at 17 U.S.C. § 12 after the 1947 amendments.

[6]Dr. King made revisions to his "I Have A Dream" speech as late as 4:00 a.m. on the day of the March. *King v. Mister Maestro, Inc.,* 224 F.Supp. 101, 103 (S.D.N.Y.1963).

16

to the performance that was necessary to transform his common law copyright into a statutory copyright under § 11 of the 1909 Act.

Therefore, it is my view that the trial court erred by failing to recognize the special nature of performed works such as speeches which was recognized by the principle under the common law and the 1909 Act that performance does not constitute publication in the absence of an authorized distribution of tangible copies without a copyright notice or a reservation of rights.[7] "[W]hatever the sufficiency of the rationale, whatever the bearing of pragmatic considerations, the law was clear prior to 1978, and remains clear that performance is not publication."  1 *Nimmer on Copyright* § 4.08[B]. Consequently, I would reverse because the trial court relied upon Dr. King's performance of the speech to conclude that a general publication had occurred.

### B.

The trial court ruled that the widespread dissemination of the speech, which was due in large measure to the efforts of the March organizers, supported the conclusion that it had been placed into the public domain.  In my opinion, this reasoning is incorrect because the size of the audience before whom a work is performed is irrelevant to the issue of publication.

A conclusively established corollary to the rule, which prescribes that performance does not constitute a general publication, is the principle that the size of an audience before whom an unpublished work is performed is irrelevant to the issue of publication.  Again, a return to the 1976 Act, which as to performance merely codified the prior copyright law that had existed under state common law and the 1909 Act, is informative.  "[P]erformances ... for example—[are] not a publication no matter how many people are exposed to the work."  H.R.Rep. No. 94-1476, at 138 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5754. "Oral delivery of a speech does not constitute a publication thereof regardless of a vast national audience *via* television and radio."  *Nimmer on Copyright* § 4.08[A].

---

[7]Presumably, the tangible copies would have to be substantially or essentially identical to the performed work.

17

In holding that dissemination by performance could be so widespread as to constitute a general publication, the trial court relied upon *International Tape Mfrs. Ass'n v. Gerstein,* 344 F.Supp. 38, 56-57 (S.D.Fla.1972), *vacated* 494 F.2d 25 (5th Cir.1974). *King II,* 13 F.Supp.2d at 1351-52. I have doubts about whether *Gerstein* provides a sufficiently compelling authority upon which to base a ruling because it is questionable whether a vacated decision is a proper authority for precedential support. *See Los Angeles County v. Davis,* 440 U.S. 625, 634 n. 6, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979) (Supreme Court decision vacating judgment of Court of Appeals deprives opinion of lower appellate court of precedential effect). This is especially so inasmuch as the case was vacated on ripeness grounds. In *Gerstein,* the Court of Appeals was critical of the "abbreviated nature of the proceedings below" where "[t]he trial court had held no hearing, had received no evidence or affidavits, and had given defendants no opportunity to file an answer. There was no discovery. No one had moved for a summary judgment or judgment on the pleadings. The court simply responded to defendants' motion to dismiss by rendering judgment for plaintiff." *Gerstein,* 494 F.2d at 27 (footnote omitted).

More fundamentally, the reasoning of the *Gerstein* trial court must be rejected because, in my judgment, it is incorrect. There, the trial court relied upon three district court decisions (namely, *R.C.A. Mfg. Co. v. Whiteman,* 114 F.2d 86 (2d Cir.1940), *Shapiro, Bernstein & Co. v. Miracle Record Co.,* 91 F.Supp. 473 (N.D.Ill.1950), and *Egner v. E.C. Schirmer Music Co.,* 48 F.Supp. 187 (D.Mass.1942)) to support its conclusion that a sufficiently disseminated performance could result in a general publication. *Gerstein,* 344 F.Supp. at 56 n. 76. In each of these cases, the work, which was the subject of a copyright challenge, was of a type that was performed, namely music. To that extent, these cases are similar to Dr. King's "I Have A Dream" speech. However, none of these cases support the proposition that performance alone, if sufficiently widely disseminated, can constitute a general publication because each of the challenged works had been reduced to tangible copies which had been sold. *Whiteman,* 114 F.2d at 88; *Miracle Record,* 91 F.Supp. at 475; *Egner,* 48 F.Supp. at 189.

18

The trial court also relied upon *Burke v. NBC, Inc.,* 598 F.2d 688, 691 (1st Cir.1979), in support of its assertion that publication alone, given sufficient dissemination, could result in a general publication.[8] *King II,* 13 F.Supp.2d at 1352. The trial court appears to have relied upon the language in *Burke,* which held that "[a] general publication is such dissemination of the work itself among the public as justifies the belief that it has been dedicated to the public and rendered common property." *Burke,* 598 F.2d at 691.

Although the reasoning of the trial court may have been justified on the basis of works that are manifested through a physical object, such as books or pieces of art, it is inapplicable to performed works because of the axiom that performance is not a publication, regardless of the size of the audience. This axiom negates any inference that the amount of the dissemination is sufficient to justify a belief that a performed work was dedicated to the public and thus entered into the public domain inasmuch as an inherent tension exists between the two doctrines. If the size of an audience has no effect on the rule that performance is not a publication, then no degree of dissemination due to performance could result in a dedication to the public. Importantly, the distinction that I seek to draw is consistent with the *Ferris* holding that performance does not amount to an abandonment of title or to a dedication of the work to the public at large. *Ferris,* 223 U.S. at 435-36, 32 S.Ct. 263.

The logical result of the rule that performance cannot constitute a publication regardless of audience size is that an affirmative effort to obtain press coverage does not constitute an exception because media coverage does nothing more than increase the size of the audience, which is irrelevant to the issue of publication. Thus, I am of the opinion that the trial court erroneously found that a general publication existed in part because of the widespread dissemination of the speech that had been implemented by the concerted efforts of the March organizers to maximize press coverage. The trial court appears to have found the following factors to be determinative on this issue: (1) "the March organizers were aware of and encouraged

---

[8]The trial court also cited *Silverman v. CBS, Inc.,* 632 F.Supp. 1344, 1353 (S.D.N.Y.1986), *aff'd in part, vacated in part on other grounds by* 870 F.2d 40 (2d Cir.1989). However, the cited portion of the opinion does not support this proposition.

19

the press' coverage of the March," (2) "the studied effort by March organizers to secure as wide dissemination of the March's speeches as possible," (3) "[d]issemination of the speakers' words to the greatest public audience possible was one goal of the March organizers," (4) "[t]he press was invited to attend and to film the day's events," (5) "[t]he March was broadcast live on multiple television networks and radio stations, and portions, including Dr. King's speech, were subsequently re-broadcast," (6) "[a]t no point was the press given express limitations regarding who could film the event or the extent to which their footage could be used," (7) "there is no indication that any such limitations were made or implied," and (8) "there is no record of objections by Dr. King or by other March participants or organizers as to the press' coverage of the event."[9] *King II,* 13 F.Supp.2d at 1352. All of these factors, with the exception of the first, were "crucial" to the finding by the trial court that a general publication had occurred. *Id.* I believe that this reasoning is incorrect as a matter of law. Since the size of the audience before whom a performance occurs is irrelevant, each of these considerations constitute an invalid basis upon which to find a general publication because they amount to nothing more than an effort to assure the dissemination of the performance to the largest audience possible. Thus, the district court essentially created an exception to the audience-size-is-irrelevant rule based on the public interest in Dr. King's speech. There is no authority for such an exception. In the fair use decision of *Harper & Row, Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 555-60, 569, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985), the Supreme Court premised its holding on the principle that the copyright laws protect all authors equally, regardless of the public import of, or interest in, their work. "Congress has not designed, and we see no warrant for judicially imposing, a 'compulsory license' permitting unfettered access to the unpublished copyrighted expression of public figures." *Harper & Row,* 471 U.S. at 569, 105 S.Ct. 2218.

## C.

---

[9]Among these listed factors that were included by the trial court is the following statement: "Dr. King provided the press with an advance text of his speech to enable them to film and broadcast the events more easily." *King II,* 13 F.Supp.2d at 1352. However, the trial court later indicated that it did not rely upon the partial advance press draft to reach its conclusion. *Id.* at 1353 n. 5.

The trial court also determined that a failure to control copying or reproductions of the speech supported a finding of a general publication. *King II,* 13 F.Supp.2d at 1352. This principle appears to originate from *American Tobacco Co. v. Werckmeister,* 207 U.S. 284, 300, 28 S.Ct. 72, 52 L.Ed. 208 (1907), which stated in dicta that "[w]e do not mean to say that the public exhibition of a painting or statue, where all might see and freely copy it, might not amount to publication within the statute, regardless of the artist's purpose or notice of reservation of rights which he takes no measure to protect." In addition, the decision by the trial court evidenced its reliance upon the principle from *American Tobacco,* 207 U.S. at 299, 28 S.Ct. 72, in which the Supreme Court indicated that the test for a general publication is whether an exhibition of the work to the public evinces a dedication without a reservation of rights rather than merely the right to view and inspect. *King II,* 13 F.Supp.2d at 1352.

I believe that the court below erred when it failed to recognize that these maxims have no application in the context of performed works, as made clear by *Ferris,* which was decided over four years after *American Tobacco.* In *Ferris,* the Supreme Court, immediately after enunciating the rule that performance alone cannot constitute publication, quoted favorably from a treatise by Justice Story.

> Story states the rule as follows: "So, where a dramatic performance has been allowed by the author to be acted at a theater, *no person has a right to pirate such performance, and to publish copies of it surreptitiously;* or to act it at another theater without the consent of the author or proprietor; *for his permission to act it at a public theater does not amount to an abandonment of his title to it, or to a dedication of it to the public at large.*" It has been said that the owner of a play cannot complain if the piece is reproduced from memory. But the distinction is without sound basis and has been repudiated.

*Ferris,* 223 U.S. at 435-36, 32 S.Ct. 263 (emphasis added and citations omitted). The opportunity to copy or reproduce a performed work, or the fact of performance in and of itself, has no relevance to the issue of whether it has been placed into the public domain because the performance "does not amount to an abandonment of [the author's] title to it, or to a dedication of it to the public at large." *See also Nutt v. National Inst. Inc. for the Improvement of Memory,* 31 F.2d 236, 238 (2d Cir.1929) ("Even where the hearers are allowed to make copies of what was said for their personal use, they cannot later publish for profit that

21

which they had not obtained the right to sell."). Moreover, given that Dr. King's speech enjoyed the automatic protection of common law copyright, it is significant that CBS did not point to any authority in which forfeiture was found on the basis of the copying activities or the reproduction of copyrighted work by a third party.

The trial court acknowledged the import of *Ferris,* but distinguished it in the following manner:

> [h]owever, the case sub judice [sic] quite a different factual scenario from that confronted in *Ferris v. Frohman,* in which it was held that the performance of a play did not destroy common law copyright. A closer situation would be presented if the owner of the common law right to the play in *Fromer v. Ferris* [sic] had not only allowed the performance of his play but also had invited the press to attend, film, broadcast it live on numerous television and radio stations, and replay parts on news programs, and then the owner had sought and selectively asserted statutory copyright protection. The court does not believe that such inconsistent actions, as occurred in the captioned case, can be seen as anything other than a general publication extinguishing common law copyright protection.

*King II,* 13 F.Supp.2d at 1351. In support of this reasoning, the trial court opined that "[t]he concept that dissemination by performance could reach such heights as to be a publication is not a new one," relying upon *Gerstein. King II,* 13 F.Supp.2d at 1351. However, as indicated above, *Gerstein* does not validly support that proposition.[10]

The trial court also cited *Letter Edged in Black Press, Inc. v. Public Bldg. Comm'n of Chicago,* 320 F.Supp. 1303 (N.D.Ill.1970), where a general publication of a sculpture had been found to exist based upon the lack of restriction on the copying and successful efforts to court press coverage, with no restrictions on press reproductions. *King II,* 13 F.Supp.2d at 1354. However, I believe that *Letter Edged in Black Press* is not applicable to this controversy for several reasons.

First, that court had placed importance on the supplying of uncopyrighted tangible copies, in the form of photographs of the work, which were made available upon request. *Letter Edged in Black Press,* 320 F.Supp. at 1311. By contrast, no similar situation is presented in the decision below because the trial court

---

[10]*See supra* Part I(B).

expressly disavowed any reliance on the only two tangible copies in evidence. *King II,* 13 F.Supp.2d at 1353 n. 5.

Second, and more fundamentally, *Letter Edged in Black Press* is distinguishable, in that the copyrightable work at issue was physical and thus the application of the *American Tobacco* principles was justified. In contrast, the situation presented here involves a copyrightable work that is manifested by performance. The *American Tobacco* principles of unfettered copying and reproduction, or an exhibition which demonstrates a dedication without reservation of rights, are inapposite to performed works in the absence of an authorized distribution of tangible copies. Otherwise, it would be very difficult, if even possible, to explain the results in *Silverman v. CBS, Inc.,* 632 F.Supp. 1344, 1347, 1350 (S.D.N.Y.1986), *aff'd in part, vacated in part on other grounds by* 870 F.2d 40 (2d Cir.1989)[11] and *CBS, Inc. v. Documentaries Unlimited, Inc.,* 42 Misc.2d 723, 248 N.Y.S.2d 809, 811 (1964),[12] where Appellee was held by the trial court to have a valid copyright over radio broadcasts whose performances were ostensibly disseminated to thousands, or perhaps even millions, of people.

### D.

For the reasons that have been explained above, I would hold that no publication, general or limited, occurred because Dr. King's delivery of his "I Have A Dream" speech was a mere performance of that work, and performance simply cannot constitute a publication regardless of (1) the size of the audience involved, or (2) efforts to obtain widespread contemporary news coverage under circumstances that may have allowed the copying of the work.[13] It is my belief that this analysis (1) differs significantly from one which is

---

[11]The court determined that CBS had a copyright over radio broadcasts of "The Amos 'n' Andy Show" from 1928 to 1948 because the " 'rendering of the performance before the microphone cannot be held to be an abandonment of ownership to it by the proprietor or a dedication of it to the public at large,' " quoting *Uproar Co. v. NBC,* 8 F.Supp. 358, 362 (D.Mass.1934), *modified* 81 F.2d 373 (1st Cir.1936).

[12]The court determined that CBS had a copyright over a radio broadcaster's news announcement concerning President Kennedy's assassination.

[13]For the same reasons as Chief Judge Anderson specifies in footnote four to his opinion, I also emphasize that this result has been reached without any reliance on the partial advance press draft or the SCLC

premised on a limited publication theory, and (2) also avoids the legal fiction of declaring that Dr. King's "I Have A Dream" speech, as a limited publication, was communicated to a select group for a narrow purpose, a holding that has been generally criticized by commentators.[14]

RONEY, Senior Circuit Judge, dissenting:

I respectfully dissent on the ground that the district court correctly held there was a general publication. I would affirm on the basis of the district court opinion. *Estate of Martin Luther King, Jr., Inc. v. CBS, Inc.,* 13 F.Supp.2d 1347 (N.D.Ga.1998).

---

newsletter.

[14]*E.g., Nimmer on Copyright* § 4.13[A] n.11; Marshall A Leaffer, *Understanding Copyright Law* § 4.5[C] at 112-13 (2d ed.1995); 1 William F. Patry, *Copyright Law and Practice* at 418 n.80 (1994); E. Fulton Brylawski, *Publication: Its Role in Copyright Matters, Both Past and Present,* 31 J. Copyright Soc. U.S.A. 507, 522 (1984).